UNITED STATES of America, Appellee,

v.

William P. PITRONE.

No. 96–2090.

United States Court of Appeals,
First Circuit.

Heard May 8, 1997.
Decided May 22, 1997.

Peter B. Krupp, Boston, MA, with whom Lurie & Krupp LLP, was on brief, for appellant.

Nadine Pellegrini, Assistant United States Attorney, Boston, MA, with whom Donald K. Stern, United States Attorney, was on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

SELYA, Circuit Judge.

This harlequinade requires us to examine a matter of first impression: the degree of scienter needed for a felony conviction under 16 U.S.C. § 707(b) (1994), a part of the Migratory Bird Treaty Act (MBTA). Detecting no reversible error in the district court's rejection of the defendant's proffered jury instruction or in any other respect, we affirm the judgment of conviction.

## I. THE STATUTORY SCHEME

In 1916, the United States and Great Britain (acting for Canada) negotiated a treaty to protect migratory birds. *See* Convention for the Protection of Migratory Birds in the United States and Canada, Aug. 16, 1916, U.S.-Can., 39 Stat. 1702; *see also* S.Rep. No. 99–445 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6113, 6114 (reviewing the MBTA's historical antecedents). The treaty provides for the safeguarding of migratory birds whose pilgrimages traverse international borders. To effectuate this commitment,[1] Congress enacted the MBTA in 1918. The United States Department of the Interior is charged with administering the MBTA, *see* 16 U.S.C. § 701 (1994), and the Secretary has promulgated a web of regulations. The statute and the regulations offer substantial shelter to migratory birds within the United States.

This case pirouettes around a provision of the MBTA which criminalizes the taking and selling of migratory birds:

Whoever, in violation of this subchapter, shall knowingly—

(1) take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird, or

(2) sell, offer for sale, barter or offer to barter, any migratory bird shall be guilty of a felony and shall be [punished as provided].

16 U.S.C. § 707(b) (1994). Under this proviso, it is unlawful for a taxidermist to receive money or compensation in exchange for a

---

1. The MBTA also is in service to other treaty obligations. *See, e.g,* Convention for the Protection of Migratory Birds and Birds in Danger of Extinction and Their Environment, March 4, 1972, U.S.-Japan, 25 U.S.T. 3329; Convention for the Protection of Migratory Birds and Game Mammals, Feb. 7, 1936, U.S.-Mexico, 56 Stat. 1347.

migratory bird other than from a person who originally provided the bird and requested the taxidermy services. *See* 50 C.F.R. § 21.24(c)(1), (2) (1996). In other words, a taxidermist may receive, transport, possess, and mount migratory birds for another person, but he may not sell any migratory birds (mounted or not) which he has taken out of the wild.

## II. BACKGROUND

Following accepted practice, we sketch the facts in the light most favorable to the jury verdict, consistent with record support. *See United States v. Staula*, 80 F.3d 596, 599 (1st Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 156, 136 L.Ed.2d 101 (1996); *United States v. Echeverri*, 982 F.2d 675, 676 (1st Cir.1993).

Defendant-appellant William P. Pitrone is a taxidermist by trade and a huntsman by choice. Pitrone frequented sportsmen's shows at which he offered for sale mounted game birds. In early 1993, a browser, Chris Giglio, spotted a protected migratory bird (a Common Eider) among the birds that Pitrone displayed for sale at a show held in Boston. When Giglio began questioning Pitrone about the Eider, Pitrone immediately inquired whether Giglio was "a warden" and, upon receiving an assurance that Giglio was not, freely discussed his operation and produced a business card. Giglio suspected that Pitrone was violating federal law and informed the Interior Department's Fish and Wildlife Service (FWS) of his suspicions.

At the behest of the FWS, Giglio contacted Pitrone by telephone and arranged to visit him at his home in Medford, Massachusetts. Once inside, Giglio observed that Pitrone maintained a large inventory of mounted waterfowl. Pitrone declared that all the mounts were for sale. When Giglio reported this information to the FWS, the agents smelled smoke. They outfitted Giglio with cash and a clandestine body recorder, and sent him back to Pitrone's residence in search of fire. During the ensuing conversation, Pitrone volunteered that he had recently been to Alaska to hunt Harlequin ducks (a protected species of migratory bird) and claimed to have bagged 42 of them. He also said that he sold standing mounts for $50 apiece, flying mounts for $60 apiece, and Harlequin mounts for $75 apiece.

On May 13, 1993, Giglio returned to Pitrone's abode, this time accompanied by an undercover FWS agent. During this meeting (which Giglio surreptitiously recorded), Pitrone crowed that he had sold the 42 Harlequin mounts for $75 each, and he described in colorful language the enthusiasm with which decoy carvers clamored to purchase them. When asked why Harlequins cost more than other mounts, Pitrone replied that the price differential reflected the additional cost he had incurred in travelling to Alaska to hunt them.

By the fall of 1995, the FWS had its ducks in a row and a federal grand jury returned an eight-count indictment. At trial, the prosecution relied, *inter alia*, on the testimony of Giglio, FWS agent Robert Garabedian, and four of Pitrone's customers. One customer, James Olenick, told Pitrone in advance of the Alaska hunting trip that he would be interested in purchasing a Harlequin duck if Pitrone bagged one. Olenick subsequently bought such a duck from Pitrone (a transaction that formed the basis for the count of conviction). After the FWS investigation surfaced, Pitrone contacted Olenick and suggested that, if approached, he should tell the FWS agents that the duck was merely a "leftover," implying that Pitrone gave it to him as a gift. James Boone, another customer, stated that he had purchased mounts from Pitrone and had provided him with a "wish list" of mounts he sought to purchase. A third customer, Donald Todd, testified that Pitrone contacted him after a sale of two mounts and requested that Todd, if questioned by the FWS, tell the agents that his payment to Pitrone had not been for merchandise received but for services rendered. A fourth customer, George Anzivino, said Pitrone bragged that he had sold all the Harlequin ducks he had shot in Alaska, that the hunt had cost him $2400, and that he had recouped the cost by selling the birds. Later, Pitrone admonished Anzivino not to mention their conversation to anyone.

The trial lasted for six days. In the end, the jury acquitted Pitrone on seven counts, but found him guilty on count 2 (the knowing

**4**

sale of a Harlequin duck). Following the imposition of sentence, Pitrone sought refuge in this court.

## III. ANALYSIS

On appeal, Pitrone grouses about two rulings. One complaint implicates the jury instructions and the other centers around the admission of evidence. We discuss these remonstrances separately.

### A. *The Jury Instructions.*

 If a party asserts that an error infected the instructions given to a trial jury, a reviewing court must determine if the instructions "adequately illuminate[d] the law applicable to the controlling issues in the case without unduly complicating matters or misleading the jury." *United States v. DeStefano*, 59 F.3d 1, 3 (1st Cir.1995). When, as now, the alleged error involves the interpretation of the elements of a statutory offense, it poses a question of law and sparks plenary review. *See United States v. Carroll*, 105 F.3d 740, 744 (1st Cir.1997).

In this instance, Judge Gertner instructed the jurors that, in order to convict on count 2, they must find that Pitrone acted knowingly. This meant, the judge explained, that "he was conscious and aware of his actions, realized what he was doing and what was happening around him, and did not act because of ignorance, mistake, or accident." The government, she added, did not need "to prove that the defendant knew that his actions were unlawful," but he "must know within the meaning of the statute that he was selling a bird." Pitrone requested a more lenient instruction and objected to the instruction actually given on the ground that it did not require the government to prove that the defendant knew his actions contravened federal law.

On appeal, Pitrone widens the scope of his barrage. While he renews his claim that the government should have been required to prove beyond a reasonable doubt that he knew his conduct was unlawful (and, therefore, that the jury should have been so instructed), he goes on to raise a new and entirely different point: that the instruction afforded the jury was defective because it did not require the government to prove that he knew he was selling a *migratory* bird. We address the second claim first.

Pitrone cannot duck one basic fact: he did not object below to the omission of a specific statement that the government must prove that he knew he was selling a migratory bird (as opposed to a bird, simpliciter). For all intents and purposes, that ends the matter. We have been steadfast in treating as forfeit objections to a judge's charge that might have been, but were not, raised below in the approved manner.[2] *See, e.g., United States v. Griffin*, 818 F.2d 97, 99–100 (1st Cir.1987); *United States v. Coady*, 809 F.2d 119, 123 (1st Cir.1987); *cf. Putnam Resources v. Pateman*, 958 F.2d 448, 456 (1st Cir.1992) (holding, under substantially identical civil counterpart, that "[s]ilence after instructions ... typically constitutes a waiver of any objections").

 To be sure, we still retain the power to grant relief under the plain error doctrine, notwithstanding that Pitrone did not preserve this claim of error. Fed.R.Crim.P. 52(b). Still, a party who asks an appellate tribunal to correct an error not preserved at the trial level must demonstrate "(1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.'" *Johnson v. United States*, ─── U.S. ───, ───, 117 S.Ct. 1544, 1546, 137 L.Ed.2d 718 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776–77, 123 L.Ed.2d 508 (1993)). Even then, the appellate court may exercise its discretion to correct a forfeited error only if the error seriously impairs the integrity and basic fairness of the proceedings. *See id.* Given these criteria, it is apparent that "the

---

2. A party who objects to jury instructions in a criminal case must follow a regime that is delineated in Fed.R.Crim.P. 30. The rule provides in pertinent part:

No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.

plain error hurdle is high." *United States v. Hunnewell*, 891 F.2d 955, 956 (1st Cir.1989). Pitrone cannot surmount it here.

■ For present purposes, we need look only to the last element of the test. In the district court, there was never any issue about whether a Harlequin duck was a migratory bird (it is) or whether Pitrone, a nimrod of note, knew as much (it strains credulity to suggest he did not). In this regard, the instructions that he proposed are telling; he beseeched the lower court to charge the jury "that the government must prove beyond a reasonable doubt: first, that Mr. Pitrone actually knew that he was selling *the* migratory birds, as opposed to giving away *the* birds and charging only for his mounting services (emphasis supplied)." This proposed instruction assumes that Pitrone knew he was selling migratory birds, as demonstrated by the repeated use of the article "the." And, moreover, Pitrone has limned no plausible basis for believing that he lacked such knowledge.

Where, as here, a defendant criticizes a jury instruction on a ground not raised below, and does so on the basis of an alleged error induced at least in part by his implied concessions before the district court, it will be infrequent that he can satisfy the fourth furcula of the plain error test. In this respect, the case at hand is not a *rara avis*. Thus, the omission, if error at all—a matter on which we do not opine—did not "seriously affect the fundamental fairness" of Pitrone's trial, *Griffin*, 818 F.2d at 100, and, thus, did not constitute plain error. *See Johnson*, —— U.S. at ——, 117 S.Ct. at 1550 (suggesting, in words appropriate here, that "it would be the reversal of a conviction such as this" which would run afoul of fundamental fairness).

We turn next to the compass of the term "knowingly" as that word is used in MBTA § 707(b). The statute proscribes, *inter alia*, "knowingly" taking migratory birds with intent to sell them and "knowingly" selling such birds. Since the meaning of the word "knowingly" is neither precisely defined in the statute itself nor immediately obvious in the statutory context, we resort to the legislative history. *See United States v. Ven-*

*Fuel, Inc.*, 758 F.2d 741, 757–58 (1st Cir. 1985).

For most of its existence, the MBTA contained no scienter requirement whatever; its felony provision, like its misdemeanor provision, 16 U.S.C. § 707(a), imposed strict liability. *See* Pub.L. 86–732, 40 Stat. 756 (1960) (amended by Pub.L. 99–645, 100 Stat. 3590 (1986)). But in 1985, the Sixth Circuit held that the felony provision—section 707(b)— ran afoul of the Due Process Clause on this account. *See United States v. Wulff*, 758 F.2d 1121, 1125 (6th Cir.1985). The following year, Congress amended section 707(b) to meet the *Wulff* court's objection by including an element of scienter, that is, by adding the modifier "knowingly." *See* S. Rep. 99–445, *supra*, 1986 U.S.C.C.A.N. at 6128. Congress clearly indicated that, by inserting this word, it sought only to require proof that "the defendant knew (1) that his actions constituted a taking, sale, barter, or offer to sell or barter, as the case may be, and (2) that the item so taken, sold, or bartered was a bird or portion thereof." *Id.* At the same time, Congress warned that: "It is not intended that proof be required that the defendant knew the taking, sale, barter or offer was a violation of the subchapter, nor that he know the particular bird was listed in the various international treaties implemented by this Act." *Id.*

■ Against this backdrop, Pitrone's assertion that the word "knowingly" modifies the phrase "in violation of this subchapter" and, thus, requires proof of specific intent in order to convict, is unconvincing. When it is necessary to go beyond the text in construing criminal statutes, meaning ordinarily should be derived by "draw[ing] upon context, including the statute's purpose and various background legal principles, to determine which states of mind accompany which particular elements of the offense." *United States v. Gendron*, 18 F.3d 955, 958 (1st Cir.1993). The appellant's interpretation of the MBTA flouts this precept: it not only involves a forced reading of the text but also flatly contradicts Congress's stated purpose. We are, therefore, disinclined to swallow it.

**6**

We find encouragement for this disinclination in *United States v. Flores,* 753 F.2d 1499 (9th Cir.1985), a case which posed an analogous interpretive problem. Determining that the word "knowingly" in 18 U.S.C. § 922(e) modified the phrase describing the prohibited act—delivering or causing to be delivered firearms to any common carrier without written notice—the Ninth Circuit read the language naturally and held that the government need not prove a specific intent to violate the statute. *See id.* at 1505. In reaching this conclusion, the court stressed "the absence of words such as 'intent' and 'willfully,' which traditionally accompany specific intent crimes" and the lack of any other indication that Congress purposed to require an element of specific intent. *Id.* The instant case is a supercharged version of *Flores;* in drafting the amendment to section 707(b), Congress not only omitted language indicating that it specifically intended to make specific intent an element of the offense but also stated positively that it did not intend to do so.

Pitrone tries to make an end run around the lessons taught by the legislative history, citing a plethora of cases headed by *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994). But this argument overlooks (or, at least, fails to acknowledge) that the element of willful intent and the element of scienter are birds of a very different feather: the cases which the appellant includes in this string citation stand for the proposition that knowledge of the unlawfulness of one's conduct is required when the statutorily prohibited behavior includes an element of *willful* intent. *See id.* at 143–49, 114 S.Ct. at 660–63; *United States v. Jain,* 93 F.3d 436, 439–41 (8th Cir.1996); *United States v. Sanchez–Corcino,* 85 F.3d 549, 552–54 (11th Cir.1996); *United States v. Curran,* 20 F.3d 560, 566–71 (3d Cir.1994).

Here, the proposition is beside the point. The applicable statute, section 707(b), requires the government to prove a knowing act, but it does not require proof of willful-

ness. That makes a world of difference. "Knowingly" has a meaning distinct from "willfully" in the lexicon of statutory construction. *See United States v. Hayden,* 64 F.3d 126, 129–30 (3d Cir.1995). Thus, courts consistently have rejected arguments—as we do here—which posit that the term "knowingly," standing alone, requires the prosecution to show that the defendant knew his behavior was unlawful, instead interpreting "knowingly"—as we do here—to require no more than that "the defendant know he was engaging in the prohibited conduct." *Id.* at 130 (collecting cases); *see also United States v. Sherbondy,* 865 F.2d 996, 1001–03 (9th Cir.1988) (explaining that "knowingly" does not ordinarily include a requirement that the defendant have had knowledge of the law). By contrast, "willfully"—a word which is conspicuously absent from section 707(b)—sometimes has been construed to require a showing that the defendant knew his behavior transgressed the law. *See Ratzlaf,* 510 U.S. at 141–43, 114 S.Ct. at 659–60. We decline either to read into a statute a word that Congress purposely omitted, or, on our own initiative, to rewrite Congress's language by ascribing to one word a meaning traditionally reserved for a different word.

Pitrone also floats a bareboned constitutional argument. Citing *Wulff,* 758 F.2d at 1124–25, he contends that section 707(b), read as we propose to read it, remains subject to the same constitutional infirmity which prompted the Sixth Circuit to strike down the earlier (unamended) version. This argument was not advanced below, and for that reason, it will not fly here.[3] *See Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transp. Co.,* 953 F.2d 17, 21 (1st Cir.1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

Finally, the appellant hawks the importance of the Supreme Court's decision in

3. In all events, the argument has little substance. The *Wulff* court declared that, in order for section 707(b) to pass constitutional muster, "Congress must require the prosecution to prove the defendant acted with some degree of scienter."

758 F.2d at 1125. But Congress repaired this defect, and there is nothing in the Constitution which requires the government to prove, in a case like this, that the defendant knew his conduct was unlawful.

*Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985). There, the Court held that, when prosecuting a person for violation of the statute governing food stamp fraud (which prohibits the "knowing" acquisition of food stamps in an unauthorized manner, 7 U.S.C. § 2024(b)(1)), the government must prove the defendant knew that his conduct was unauthorized. 481 U.S. at 433, 107 S.Ct. at 1844–45. We think *Liparota* is distinguishable. First, unlike in this case, the legislative history of the provision before the *Liparota* Court shed no light on what Congress meant by the term "knowing violation." *See id.* at 424–25, 105 S.Ct. at 2087–88. Second, the Food Stamp Act covers a variegated array of conduct undertaken by literally millions of people, many of whom are unencumbered by a working knowledge of the regulatory labyrinth. These facts, together with the sheer volume of food stamp transactions which occur, create a high probability of unauthorized, yet innocent, transfers. *See id.* at 426, 105 S.Ct. at 2088–89. Thus, the *Liparota* Court sought to prevent the criminalization of a wide range of innocent behavior. *See id.*

In sharp contrast, the felony provision of the MBTA prohibits conduct that occurs on a much smaller scale and which is much more likely to be committed by individuals familiar with existing protections for migratory birds (e.g., hunters, taxidermists, scientists, or artisans whose trades require knowledge of birds' habits and attributes). Consequently, applying the scienter requirement in the manner described in the legislative history of section 707(b) does not pose the same type of threat that prompted the *Liparota* Court to condition a conviction under the Food Stamp Act upon proof that the defendant knew his behavior was unauthorized by law.

Broadly speaking, it is within the discretion of the legislature to define the elements of statutory offenses. *See United States v. Hudson,* 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812). In drafting the MBTA and thereafter in amending it, Congress carefully defined the elements of the offense created under section 707(b). In doing so, it left no room for ignorance of the law as a defense. Thus, we are constrained to give section 707(b) its natural reading, under which the word "knowingly" applies to the putative offender's actions rather than to the legality of those actions. This reading comports with the plain meaning of the MBTA, with the usual canons of statutory construction, and with Congress's revealed intent. Since the district court's instructions to the jury followed this path, we cannot honor the appellant's assignment of error.

### B. *The Evidence.*

Pitrone also protests the district court's admission of two types of evidence, namely, (1) evidence anent his hunting trip to Alaska, and (2) evidence anent his sales (and intended future sales) of birds. In each instance, he maintains that the evidence ought to have been barred as impermissible character evidence.[4] We review rulings admitting or excluding evidence for abuse of discretion. *See United States v. Rivera–Gomez,* 67 F.3d 993, 997 (1st Cir.1995). When Rule 403 balancing is in issue, we grant especially wide latitude to the district court's informed judgment. *See id.*

Here, both aspects of the evidentiary squabble originally arose in pretrial proceedings. Pitrone filed a motion in limine to exclude evidence relating to his journey to Alaska and his boast that he killed more than 40 Harlequin ducks on that trip (selling the skins for $50 each and the mounts for $75 each). He filed a separate motion to exclude

---

4. Pitrone premises this exhortation on Fed. R.Evid. 404(b) and 403. Rule 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

In turn, Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

8

evidence of sales of birds other than those which were the subject of specific counts in the indictment. The district court denied both motions, concluding that the challenged proffers not only provided direct evidence of the crime charged but also furnished relevant extrinsic evidence illustrating Pitrone's intent to hunt and sell the Harlequins, as well as the existence of a plan to do so. The prosecution subsequently introduced the evidence at trial and argued its significance to the jury.

■ Assuming, without deciding, that Pitrone's objections to the evidence were properly preserved, *cf. Conway v. Electro Switch Corp.*, 825 F.2d 593, 596 n. 1 (1st Cir.1987), his claim of error nonetheless is unavailing. In the count of conviction, the government charged Pitrone with the knowing sale of a Harlequin duck. Testimony regarding his Alaskan sojourn and his subsequent sales of Harlequin skins and mounts comprises direct evidence which helps to establish the crime charged. Because the evidence is directly probative of the crime, Pitrone's contention that it is impermissible "other act" evidence is well wide of the mark. *See, e.g., United States v. Hadfield*, 918 F.2d 987, 994–95 (1st Cir.1990).

■ The evidence of past (and future intended) sales of birds—consisting largely of statements made by Pitrone during the course of commercial transactions—is plainly relevant to illumine Pitrone's intent even though these sales are not themselves the basis of the charges preferred against him. Since Rule 404(b) evidence appropriately can be admitted for such a purpose, *see, e.g., United States v. Bank of New Eng.*, 821 F.2d 844, 858 (1st Cir.1987), the appellant's claim that it is impermissible character evidence founders.[5]

■ Moving to Rule 403, we do not find that either evidentiary line carried with it an unacceptable risk of improper prejudice. Virtually all evidence is prejudicial—if the truth be told, that is almost always why the

proponent seeks to introduce it—but it is only *unfair* prejudice against which the law protects. *See Rivera–Gomez*, 67 F.3d at 997 (collecting cases); *United States v. Rodriguez–Estrada*, 877 F.2d 153, 155–56 (1st Cir. 1989). Evidence should function to "help the jury reconstruct earlier events and then apportion guilt or responsibility as the law may require" and "Rule 403 exists to facilitate that process, not impede it." *Rivera–Gomez*, 67 F.3d at 998. Because the judicial officer who presides at a trial has a unique perspective which enables her to make assessments of this kind knowledgeably, "only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1340 (1st Cir.1988).

■ In the case at bar, these tenets augur favorably for the lower court's rulings. Under the terms of the MBTA, Pitrone could not knowingly sell a Harlequin duck. He could, however, sell his services as a taxidermist. Evidence of the sale prices of Harlequin duck skins and mounts, as contrasted with the prices of other bird mounts sold by him, laid the foundation for a permissive inference that the higher price for a Harlequin duck reflected an actual charge for the bird, above and beyond a reasonable charge for taxidermy services. Evidence of the trip to Alaska helped to explain the reason for the price differential and to show opportunity. The evidence of Pitrone's statements provided the jury with valuable insights into Pitrone's motives. All in all, the challenged evidence possessed considerable probative value.

The opposite pan of the scale is nearly empty. For one thing, the appellant has not credibly shown how the evidence threatened to trigger any of the dangers that Rule 403 bids courts to monitor. For another thing, there is nothing in the record that leads us to

---

5. If more were needed—and we doubt that it is—we note in passing that the evidence of past sales was imbricated with the charged crime and helped to put that crime into context. On that basis, too, the evidence was relevant. *See United*

*States v. DiSanto*, 86 F.3d 1238, 1252–53 (1st Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1109, 137 L.Ed.2d 310 (1997); *United States v. Rodriguez–Estrada*, 877 F.2d 153, 155 (1st Cir. 1989).

believe that the jury, which acquitted Pitrone on seven other counts, was improperly influenced by this evidence. Given the easily discernible asymmetry—substantial probative value and negligible risk of unfairly prejudicial effects—we descry no abuse of discretion in the district court's admission of the evidence.

## IV. CONCLUSION

We need go no further. From aught that appears, Pitrone was tried fairly and convicted lawfully in a proceeding untainted by reversible error. No more is exigible.

*Affirmed.*