**Elliott v. Armor Holdings, Inc.**     CV-99-337-B    01/12/00

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>J. Michael Elliott</u>

    **v.**                          Civil No. 99-337-B
                                    Opinion No. 2000 DNH 012

<u>Armor Holdings, Inc.</u>

<u>**MEMORANDUM AND ORDER**</u>

J. Michael Elliott brought this action against his former employer, Armor Holdings, Inc., claiming that Armor Holdings breached its contract with him by failing to provide him with stock options, vacation pay, and copies of his personnel file and other employment records.[1] Elliott also claims breach of the covenant of good faith and fair dealing and, in the alternative,

---

[1] Elliott originally filed this action in Rockingham County Superior Court. The case subsequently was removed to this court, which has subject matter jurisdiction based on diversity of citizenship. <u>See</u> Notice of Removal of Civil Action (part of Doc. #13) at 1-2.

quantum meruit, based on the same underlying allegations.[2]  Armor

[2]  Because Elliott's claims for breach of the covenant of good faith and fair dealing and quantum meruit derive from the same allegations that underlie his contract claim, I focus my jurisdictional analysis on the contract claim.

-2-

Holdings has moved pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss Elliott's action for lack of personal jurisdiction.[3]  For the reasons that follow, I grant Armor Holdings's motion (Doc. #5).

## I.  Standard of Review

When a defendant contests personal jurisdiction, the plaintiff bears the burden of demonstrating that a basis for asserting jurisdiction exists.  See Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998); Rodriguez v. Fullerton Tires Corp., 115 F.3d 81, 83 (1st Cir. 1997).  Because no evidentiary hearing has been held in the present case, I hold Elliott to a prima facie standard.  See

---

[3]  Armor Holdings has moved in the alternative for dismissal for improper venue pursuant to Rule 12(b)(3), based on a forum selection clause in the 1996 employment contract between the parties.  See Mem. in Supp. of Def.'s Mot. to Dismiss (Doc. #5) at 1 & n.1.  Because I find that I cannot exercise personal jurisdiction over Armor Holdings, I do not address the venue issue.

Sawtelle v. Farrell, 70 F.3d 1381, 1386 n.1 (1st Cir. 1995)

(citing United Elec. Radio and Mach. Workers of Am. (UE) v. 163

Pleasant St. Corp., 987 F.2d 39, 43 (1st Cir. 1993) [hereinafter
Pleasant St. II]).

To make a prima facie showing, Elliott may not rest on his
pleadings. Rather, he must "adduce evidence of specific facts"
that support jurisdiction. Foster-Miller, Inc. v. Babcock &
Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995); Pleasant St. II,
987 F.2d at 44. In conducting my analysis, I take the facts
proffered by Elliott as true and construe them in the light most
favorable to his jurisdictional claim. See Massachusetts Sch. of
Law, 142 F.3d at 34; Foster-Miller, 46 F.3d at 145. I do not act
as a fact-finder; rather, I determine "whether the facts duly
proffered, [when] fully credited, support the exercise of
personal jurisdiction." Rodriguez, 115 F.3d at 84 (citing Boit
v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992)).

While the prima facie standard is liberal, I need not
"'credit conclusory allegations or draw farfetched inferences.'"
Massachusetts Sch. of Law, 142 F.3d at 34 (quoting Ticketmaster-

<u>New York, Inc. v. Alioto</u>, 26 F.3d 201, 203 (1st Cir. 1994)).  I

consider facts offered by Armor Holdings, but only to the extent that they are uncontradicted.  See id.

## II.  Facts

Armor Holdings is a Delaware corporation with a principal place of business in Jacksonville, Florida.  See Spiller Aff. (Doc. #10) ¶ 2.  The company sells security services and security products, including body armor, less-than-lethal munitions, and anti-riot equipment.  See id.  These products are manufactured by Armor Holdings's wholly-owned subsidiaries.  See Elliott Aff. (attached to Doc. #9) ¶ 18.  Armor Holdings does not maintain an office or bank account in New Hampshire, is not registered to do business in New Hampshire, and owns no real property in New Hampshire.  See Spiller Aff. ¶ 3.  None of the company's subsidiaries are located in New Hampshire.  See id.

Elliott was associated with Armor Holdings from September 1991 through January 1999.  See Elliott Aff. ¶ 5.  During most of that period -- from December 1991 until some time in 1997 --

Elliott resided in Florida.  See id.  Since August 1997, Elliott has been a resident of New Hampshire.  See id. ¶¶ 2, 13.

Over the course of their relationship, the parties formed a series of agreements.  In January 1994, Elliott entered into a written, two-year employment contract with Armor Holdings.[4]  See id. ¶ 6 and Ex. A.  In January 1996, after the expiration of the 1994 agreement, the parties entered into another written employment contract ("the 1996 agreement") for a term of one year with an option (held by Armor Holdings) to renew.  See id. ¶ 7 and Ex. B.  In addition to setting forth Elliott's compensation and benefits, the 1996 agreement contained choice of law and forum selection clauses in which the parties agreed that any disputes under the contract would be governed by New York law and

---

[4]  At that time, the company was known as American Body Armor & Equipment, Inc.  See Elliott Aff. ¶¶ 5, 6.  An entity with the same name became one of Armor Holdings's wholly-owned subsidiaries.  See id. ¶¶ 18-21; Spiller Aff. ¶ 4.  To avoid confusion, I refer to the parent company, the defendant in this action, as "Armor Holdings" throughout this order.

be subject to the exclusive jurisdiction of the courts of New York County, New York. See id. Ex. B ¶¶ 11(h), (i). In December 1996, Elliott received a letter from Armor Holdings, informing him that the 1996 agreement would not be renewed when its one-year term expired on January 17, 1997. See id. ¶ 9 and Ex. C. Elliott subsequently negotiated an oral agreement ("the 1997 agreement") with Jonathan Spiller, the chief executive officer of Armor Holdings. See id. ¶ 10. While the parties dispute whether Elliott was an employee or a consultant under the 1997 agreement, they agree that their relationship ended in January 1999. Compare id. ¶¶ 10, 11 with Spiller Aff. ¶¶ 16, 20; Spiller Reply Aff. (Doc. #14) ¶ 4.

The evidence proffered by Elliott in support of his jurisdictional claim falls into three main categories: (1) evidence that Elliott performed work for Armor Holdings at his New Hampshire residence; (2) evidence that representatives of Armor Holdings advertised, marketed, and sold products in New

Hampshire; and (3) evidence that Armor Holdings acquired Safariland, Inc., a company that did business in New Hampshire. I set forth each body of evidence in turn, then discuss specific jurisdictional facts in the context of the subsequent analysis.

## A.  Elliott's Performance of Work at His New Hampshire Residence

Elliott's New Hampshire residence contained a home office in which he performed various work activities for Armor Holdings after August 1997.  See Elliott Aff. ¶¶ 2, 13.  These activities included "writing reports, drafting proposals, coordinating . . . travel plans, planning, and other company-related business."  Id. ¶ 13.  Between January and June 1998, Elliott helped to conduct negotiations and due diligence investigations related to Armor Holdings's acquisition of the law enforcement division of Mace Security (located in Bennington, Vermont) and a company called Protech Armored Products (located in Pittsfield, Massachusetts).  See id.  Elliott performed much of that work from his home in New Hampshire.  See id.

-10-

After Armor Holdings acquired Protech Armored Products, Elliott worked on the integration of Protech into Armor Holdings as a wholly-owned subsidiary.  See id. ¶ 14.  Although Armor Holdings provided Elliott with rental housing in Massachusetts during at least part of the time that he was engaged in the integration project, Elliott returned to his New Hampshire home on weekends and performed some work while in New Hampshire.  See id.; Spiller Aff. Ex. C.  Elliott also used his home office to write several proposals for government and commercial contracts on Protech's behalf after that company became a subsidiary of Armor Holdings.  See Elliott Aff. ¶ 15.

Elliott maintains that Armor Holdings was aware that he did company-related work at his New Hampshire home.  See id. ¶ 13.  Armor Holdings has attested that it never requested, required, or authorized Elliott to do work at home or otherwise perform work in New Hampshire, and that to the extent that Elliott did so, he did so "for his own convenience."  Spiller Aff. ¶ 19; see also

Spiller Reply Aff. ¶ 8.  Armor Holdings also has presented

evidence that throughout most of 1998, Elliott continued to have

an office at the company's Florida headquarters.  <u>See</u> Spiller

Aff. ¶ 19.

**B.** **Marketing and Sales in New Hampshire**
**by Representatives of Armor Holdings**

Elliott also maintains that Armor Holdings conducted business in New Hampshire by marketing and selling products manufactured by its subsidiaries to various New Hampshire law enforcement agencies. Specifically, Elliott presents evidence that Armor Holdings engaged two regional sales representatives whose territories included New Hampshire. See Elliott Aff. ¶¶ 21, 22, 23. One of these individuals, Stephen Monette, Jr., served as sales manager for the New England states from February 21, 1997 to April 17, 1999. See Monette Aff. (attached to Doc. #9) ¶¶ 4, 5, 6, 14 and Ex. A. A second, unidentified person acted as a New England sales representative between May 1998 and April 17, 1999. See id. ¶¶ 13, 14. According to Elliott, these sales representatives regularly advertised, marketed, and sold in New Hampshire products manufactured by Armor Holdings's

subsidiaries.  See Elliott Aff. ¶¶ 18, 21.[5]  Elliott was not personally involved in any of this sales activity.  See Spiller Aff. ¶¶ 6, 10.

Monette has provided an affidavit in support of Elliott's jurisdictional claim in which he details his duties and activities on behalf of Armor Holdings.  As Armor Holdings's sales representative, Monette was responsible for marketing and selling products manufactured by Armor Holdings's wholly-owned subsidiaries.  See Monette Aff. ¶¶ 7, 16.  He traveled to New Hampshire approximately once per month to make sales calls and perform product demonstrations.  See id. ¶¶ 8, 15.  Approximately

---

[5]  Armor Holdings maintains that it does not "have any employees, agents or sales representatives who perform their duties from New Hampshire," that Monette "acted as an independent sales representative on behalf of [Armor Holdings's] subsidiaries," that Monette was based in Massachusetts, and that Monette "was never in New Hampshire as a representative of [Armor Holdings]."  Spiller Aff. ¶¶ 3, 9.  Under the prima facie standard, however, I accept as true for the purposes of jurisdictional analysis Elliott's evidence that Monette and the unnamed sales representative both acted for Armor Holdings in New Hampshire.

-14-

three times per month, Monette mailed catalogues, flyers, and brochures advertising the subsidiaries' products to law enforcement agencies located throughout New Hampshire.  See id. ¶¶ 9, 15.  These efforts resulted in some sales to New Hampshire purchasers.  See id. ¶ 11 and Exs. B, C.[6]  Monette also marketed the products to distributors that, in turn, marketed and sold them to New Hampshire law enforcement agencies.  See id. ¶ 10.

Only a small fraction of the total sales of the subsidiaries' products were made in New Hampshire.  The total New Hampshire sales figures for 1998 amount to $7,150 out of $41,312,237 in national sales, or about .01708% of the total.  See Spiller Aff. ¶ 5.  The sales figures for the first half of 1999 show a similar pattern, with only $9,050 out of $25,327,955

---

[6]  Although I am assuming for purposes of jurisdictional analysis that Monette was acting as a sales representative for Armor Holdings rather than for its subsidiaries, all but one of the invoices appended to Monette's affidavit as proof of his New Hampshire sales were issued by Defense Technology Corporation of America, one of Armor Holdings's subsidiaries.  See Monette Aff. Exs. C, D.

(or .036%) made to New Hampshire purchasers.  See id. ¶ 6.

### C.  Armor Holdings's Acquisition of Safariland, Inc.

Finally, Elliott claims that Armor Holdings did business in New Hampshire by virtue of its acquisition of a company called Safariland, which became another wholly-owned subsidiary of Armor Holdings.  According to Elliott, Safariland manufactures a variety of law enforcement equipment, including body armor, holsters, and belts.  See Elliott Aff. ¶ 22.  Elliott has alleged on information and belief that these products are sold in New Hampshire.  See id.  Armor Holdings has provided the following sales figures for Safariland: $45,949,635 in total sales in 1998, $38,587.50 of which occurred in New Hampshire; $23,695,309 in total sales from January to August 1999, $49,652.70 of which occurred in New Hampshire.  See Spiller Aff. ¶ 7.

## III.  Discussion

For purposes of assessing personal jurisdiction over a nonresident defendant, "a federal court exercising diversity

jurisdiction 'is the functional equivalent of a state court sitting in the forum state.'" Sawtelle, 70 F.3d at 1387 (quoting Ticketmaster, 26 F.3d at 204). Accordingly, I must determine whether jurisdiction is proper under both the New Hampshire long-arm statute and the due process requirements of the federal constitution. See id.; Foster-Miller, 46 F.3d at 144. The New Hampshire long-arm statute applicable to foreign corporations, see N.H. Rev. Stat. Ann. § 293-A:15.10 (Supp. 1998), has been interpreted to be coextensive with federal constitutional limits on jurisdiction. See Sawtelle, 70 F.3d at 1388 (citing McClary v. Erie Engine & Mfg. Co., 856 F. Supp. 52, 55 (D.N.H. 1994)). As a result, "the traditional two-part personal jurisdiction inquiry collapses into the single question of whether the constitutional requirements of due process have been met." McClary, 856 F. Supp. at 55. Therefore, I proceed directly to the due process analysis.

The due process clause precludes a court from asserting

jurisdiction over a defendant unless "the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).  The "constitutional touchstone" for personal jurisdiction is "whether the defendant purposefully established 'minimum contacts' in the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985) (citing International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)); see also Sawtelle, 70 F.3d at 1388.  The inquiry into "minimum contacts" is necessarily fact-specific, "involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case." Pritzker v. Yari, 42 F.3d 53, 60 (1st Cir. 1994).  A defendant cannot be subjected to a forum state's jurisdiction based solely on "random," "fortuitous," or "attenuated" contacts. Burger King, 471 U.S. at 475 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984); World-Wide Volkswagen, 444 U.S. at 299)

(internal quotation marks omitted).  Rather, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

A court may assert authority over a defendant by means of either general or specific jurisdiction.  See Massachusetts Sch. of Law, 142 F.3d at 34 (citing Donatelli v. National Hockey League, 893 F.2d 459, 462-63 (1st Cir. 1990)); Foster-Miller, 46 F.3d at 144.  A defendant who has engaged in continuous and systematic activity in a forum state is subject to general jurisdiction in that forum with respect to all causes of action, even those unrelated to the defendant's forum-based activities. See Phillips Exeter Academy v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984); Donatelli, 893

F.2d at 462-63). A court may exercise specific jurisdiction, by contrast, only when the cause of action arises from, or relates to, the defendant's contacts with the forum. See id.; Pritzker, 42 F.3d at 60. "[T]he extent of the required jurisdictional showing by a plaintiff depends upon whether the litigant is asserting jurisdiction over a defendant under a theory of 'general' or 'specific' jurisdiction." Sawtelle, 70 F.3d at 1387 n.3 (citing Ticketmaster, 26 F.3d at 204 n.3). Here, Elliott contends that Armor Holdings is subject to both general and specific jurisdiction in New Hampshire. See Mem. in Supp. of Pl.'s Opp'n (Doc. # 9) at 12.

## A. Specific Jurisdiction

The First Circuit has developed a tripartite test for determining whether an exercise of specific jurisdiction comports with due process. The analysis consists of an inquiry into (1) relatedness, (2) purposeful availment (or "minimum contacts"), and (3) reasonableness. See Massachusetts Sch. of Law, 142 F.3d at 35; Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 712-13 (1st Cir. 1996). An affirmative finding on each of these three elements is required to support an assertion of specific jurisdiction. See Phillips Exeter, 196 F.3d at 288. However, "the relative strength or weakness of the plaintiff's showing on the first two elements bears upon the third element (the overall fairness of an exercise of jurisdiction)." Id. at 288 n.1 (citing Ticketmaster, 26 F.3d at 207).

In a contract action such as Elliott's, the mere existence of a contractual relationship between an out-of-state defendant and a forum-state plaintiff is insufficient, in itself, to

establish jurisdiction in the plaintiff's home forum. See Burger King, 471 U.S. at 478; Phillips Exeter, 196 F.3d at 290; Ganis Corp. of California v. Jackson, 822 F.2d 194, 197 (1st Cir. 1987); Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc., 764 F.2d 928, 933-34 (1st Cir. 1985). Under the "contract-plus" analysis adopted by the Supreme Court in Burger King, the contract between the parties is merely an intermediate step in an ongoing process. See United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1090 (1st Cir. 1992) [hereinafter Pleasant St. I] (citing Burger King, 471 U.S. at 479), appeal after remand, 987 F.2d 39 (1st Cir. 1993); Ganis, 822 F.2d at 197 (same). Accordingly, to determine whether Armor Holdings purposefully established minimum contacts with New Hampshire, I must evaluate the parties' "'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" Phillips Exeter, 196 F.3d at 290 (quoting Burger King, 471 U.S. at 479).

Moreover, I must make my assessment of Armor Holdings's New Hampshire contacts in light of "all of the communications and transactions between the parties, before, during and after the consummation of the contract." Ganis, 822 F.2d at 197.[6] With these principles in mind, I apply the tripartite test for specific jurisdiction.

### 1. Relatedness

Under the relatedness requirement, I must determine whether Elliott's claim arises out of, or relates to, Armor Holdings's

---

[6] In Ganis, the First Circuit considered a number of fact-specific "plus" factors in its "contract-plus" analysis, including: (1) the location where payments under the contract were to be sent; (2) a choice of law provision in the contract selecting the forum state's laws as governing law; and (3) the use of form contracts that bore the plaintiff's forum-state address. See 822 F.2d at 198. I discuss the first of these factors below, in the context of the relatedness requirement. The second and third factors do not apply to the facts of the present case, which involves both a written contract (the 1996 agreement) and an oral contract (the 1997 agreement), because: (1) the choice of law provision contained in the 1996 agreement designated New York law, not New Hampshire law, as governing, see Elliott Aff. Ex. B ¶ 11(i); and (2) the 1996 agreement lists Florida addresses for both Elliott and Armor Holdings. See id.

New Hampshire contacts.  See Phillips Exeter, 196 F.3d at 288; Massachusetts Sch. of Law, 142 F.3d at 35.  This requirement, which is "a flexible, relaxed standard," Pritzker, 42 F.3d at 61, is designed to focus my attention on the nexus between the defendant's forum-state contacts and the plaintiff's claim.  See Nowak, 94 F.3d at 714; Sawtelle 70 F.3d at 1389.  "The relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." Sawtelle, 70 F.3d at 1389.

As a preliminary matter, I note that only one of the three main categories of jurisdictional evidence -- the evidence that Elliott engaged in work for Armor Holdings at his New Hampshire home -- is relevant to specific jurisdiction.  The evidence that Armor Holdings marketed and sold products in New Hampshire and acquired Safariland does not relate to Elliott's claim in any

way, and thus I consider it only in my analysis of general jurisdiction.

In a contract case, "a court charged with determining the existence vel non of personal jurisdiction must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." Phillips Exeter, 196 F.3d at 289; see also Massachusetts Sch. of Law, 142 F.3d at 35 (formation); Pleasant St. I, 960 F.2d at 1089 (same). The bulk of the jurisdictional evidence produced by Elliott, including the evidence that he engaged in work for Armor Holdings at his New Hampshire home, does not bear on either the formation or breach of any of the agreements that Elliott had with Armor Holdings. Because this evidence relates to Elliott's performance, i.e., the subject matter of an agreement rather than its formation or breach, it cannot satisfy the relatedness requirement.

In order to determine whether any of Armor Holdings's New

Hampshire contacts were instrumental to making or breaking Elliott's contract, I must first determine under which contract Elliott is claiming a breach. In his original complaint filed in state court, Elliott refers to both the 1996 written agreement and the 1997 oral agreement, but does not clearly identify which of the two contracts Armor Holdings allegedly breached. See Pl.'s Compl. (part of Doc. #13) at 1-2. In his opposition to Armor Holdings's motion to dismiss, however, Elliott specifies that his "claims relate to [Armor Holdings's] breach of his [1997] oral employment agreement." Mem. in Supp. of Pl.'s Opp'n (Doc. #9) at 14. In any event, Elliott is clearly contending that the 1997 agreement adopted the same terms concerning compensation and benefits as were contained in the 1996 agreement.[7] See id. at 3-4, 18-19; Elliott Aff. ¶ 10; Pl.'s

---

[7] Armor Holdings disputes Elliott's characterization of the 1997 agreement, arguing that it created a consulting relationship under which Elliott was to be paid on an hourly basis. See Spiller Aff. ¶ 16; Spiller Reply Aff. ¶ 5. I credit Elliott's account for the purpose of determining jurisdiction, without

Compl. at 1.  Because Elliott's underlying claim, read in the most favorable light, appears to be that the 1997 agreement provided for the continuation of an ongoing relationship established under the 1996 agreement, I will consider both agreements in my assessment of relatedness.  See, e.g., Vetrotex Certainteed Corp. v. Consolidated Fiber Class Prods. Co., 75 F.3d 147, 151-53 (3d Cir. 1996) (considering for jurisdictional purposes both 1991 contract and 1992 contract, where latter renewed relationship formed under former, in action alleging breach only of the 1992 contract).

The 1996 agreement provides no support for Elliott's jurisdictional claim.  By his own evidence, Elliott demonstrates that he resided in Florida throughout the one-year period during which the 1996 agreement was in effect.  See Elliott Aff. ¶¶ 5, 7, 9.  Armor Holdings has presented uncontradicted evidence that

expressing any opinion on the merits of Elliott's underlying claims.

the 1996 agreement "was negotiated, agreed to, and entered [into] in Florida." Spiller Aff. ¶ 12. Armor Holdings sent the December 16, 1996 letter informing Elliott that the 1996 agreement would not be renewed to Elliott's Florida address. See Elliott Aff. Ex. C. There is simply no evidence in the record that Armor Holdings had any contacts with New Hampshire in relation to the formation or termination of the 1996 agreement.[8]

Moreover, Elliott has provided little evidence linking either the formation or breach of the 1997 agreement with any New Hampshire contacts made by Armor Holdings. The record is silent as to where the negotiations for the 1997 agreement took place. See Elliott Aff. ¶ 10; Spiller Aff. ¶ 16; Spiller Reply Aff. ¶¶ 4-6. Certainly there is no evidence that the negotiations took place in New Hampshire or by means of any communications directed

---

[8] The 1996 agreement also obligated Armor Holdings to reimburse Elliott for his monthly dock rental at the Pablo Creek Marina, in Florida. See Elliott Aff. Ex. B ¶ 4(d); Spiller Aff. ¶ 12 and Ex. B ¶ 4(d).

into or out of New Hampshire.  Rather, it appears that the negotiations took place some time prior to Elliott's establishment of his New Hampshire residence.  See Elliott Aff. ¶¶ 2, 10.  Under the contract-plus analysis discussed above, "[t]he location of the negotiations is vitally important to the jurisdictional inquiry in a case like this one.  If the negotiations occurred outside the forum state, their existence cannot serve to bolster the argument for the assertion of jurisdiction in the forum."  Pleasant St. I, 960 F.2d at 1090.

The record contains some evidence suggesting a link between the alleged breach of the 1997 agreement and Armor Holdings's New Hampshire contacts.  The crux of Elliott's underlying contract claim is that Armor Holdings breached the parties' agreement by failing to provide him with certain stock options, benefits, and records.  Elliott has proffered evidence that he discussed the issue of his stock options in telephone conversations with Jonathan Spiller and other Armor Holdings employees.  See Elliott

-29-

Aff. ¶ 11.  These telephone calls lend scant support to Elliott's jurisdictional claim, however, because Elliott does not specify which party initiated the calls, nor does he attest that he was in New Hampshire when the calls were made.

More important to my analysis is correspondence between Armor Holdings and Elliott at his New Hampshire home.  On November 9, 1998, Elliott sent a letter from New Hampshire to Armor Holdings CEO Jonathan Spiller, in which Elliott raised the issue of his stock options.  See id. ¶ 11 and Ex. D.  On March 18, 1999, Elliott sent a letter to Jennifer Gouin, Armor Holdings's vice president of human resources, requesting issuance of the stock options, payment for the vacation time, and delivery of the personnel records that are the subject of the present suit.  See Spiller Reply Aff. Ex. B.  On April 7, 1999, Gouin responded in a letter sent to Elliott at his New Hampshire home. In her letter, Gouin communicated the company's contention that Elliott was not entitled to the stock options, vacation pay, or

-30-

personnel records that he requested.  See id. Ex. A.

The transmission of information into New Hampshire by mail or telephone is undoubtably a forum-related contact for due process purposes.  See Massachusetts Sch. of Law, 142 F.3d at 36; Sawtelle, 70 F.3d at 1389-90.  The question here is whether the correspondence and any telephone calls that Armor Holdings employees may have placed to Elliott in New Hampshire were instrumental to the breach of the 1997 agreement.  See Phillips Exeter, 196 F.3d at 289.  The answer to this question is no. Properly construed, the correspondence and any related telephone calls constitute notice to Elliott of the alleged breach, rather than the actual mechanism of breach.  As such, they were not instrumental in causing the breach and do not satisfy the relatedness requirement.  Cf. Ticketmaster, 26 F.3d at 207 (noting that the relatedness requirement focuses on "the element of causation").

Finally, Elliott maintains that the breach of the 1997

agreement occurred in New Hampshire because that is the place where he felt its effects. See Mem. in Supp. of Pl.'s Opp'n (Doc. #9) at 15. Elliott thereby suggests, although he does not provide any evidence to support the suggestion, that the compensation and benefits that are the subject of his underlying claim were payable to him in New Hampshire. In a recent opinion, the First Circuit noted that "courts repeatedly have held that where payments are due under a contract is a meaningful datum for jurisdictional purposes." Philips Exeter, 196 F.3d at 291; see also Ganis, 822 F.2d at 198. However, as the court went on to explain, "that fact alone does not possess decretory significance." Phillips Exeter, 196 F.3d at 291 (citing Kulko v. Superior Court, 426 U.S. 84, 93, 97 (1978); Hanson, 357 U.S. at 252; Kerry Steel, Inc. v. Paragon Inds., Inc., 106 F.3d 147, 152 (6th Cir. 1997)). Elliott, like the plaintiff in Phillips Exeter, has failed to make a persuasive argument that the location where payments were due is dispositive of the

jurisdictional claim.  See id.  This is especially true in the present case, where the parties' evidentiary submissions do not clearly establish that payments were due in New Hampshire.

In sum, I conclude that Elliott has not made the necessary prima facie showing under the relatedness requirement.[9]  However, to ensure that Elliott's jurisdictional claim receives the fullest consideration, I proceed to the purposeful availment

---

[9]  Elliott's reliance on Pelchat v. Sterilite Corp., 931 F. Supp. 939 (D.N.H. 1996) to show relatedness, see Mem. in Supp. of Pl.'s Opp'n (Doc. #9) at 14-15, is misplaced.  Pelchat involved a New Hampshire employee's claim that her Massachusetts employer violated her rights under the Family and Medical Leave Act (FMLA) by harassing her during her FMLA leave by means of repeated telephone calls to her New Hampshire home.  See id. at 942 & n.1. Assuming, without deciding, that the employer's telephone calls constituted interference with the plaintiff's benefits under the FMLA, the court concluded that the plaintiff had satisfied the relatedness requirement.  See id. at 945.  Pelchat is clearly distinguishable from the present case on at least two grounds: (1) because the jurisdictional analysis in Pelchat focused on a claim under the FMLA, rather than a contract claim, the requirement that the defendant's forum-related contacts be instrumental to the formation or breach of a contract did not apply; and (2) the employer's New Hampshire contacts in Pelchat, unlike Armor Holdings's New Hampshire contacts in the present case, were directly related to the plaintiff's claim.

prong of the tripartite test.

## 2.   **Purposeful Availment**

Under the second element of the tripartite test, I must determine whether Armor Holdings's forum-related contacts constitute a purposeful availment of the privilege of conducting activities in New Hampshire, thereby invoking the benefits and protections afforded by New Hampshire's laws.  See Burger King, 471 U.S. at 475; Phillips Exeter, 196 F.3d at 288; Nowak, 94 F.3d at 712-13.  The purposeful availment requirement focuses on "whether a defendant 'has engaged in any purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable.'"  Sawtelle, 70 F.3d at 1391 (quoting Rush v. Savchuk, 444 U.S. 320, 329 (1980)).  Its function is to ensure "that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state."  Id. (quoting Keeton, 465 U.S. at 774).

Purposeful availment rests on two cornerstones:

voluntariness and foreseeability.  See id.; Ticketmaster, 26 F.3d at 207.  First, the defendant's contacts with the forum state must be voluntary.  See Nowak, 94 F.3d at 716.  This requirement is not satisfied when those contacts are "based on the unilateral actions of another party or third person."  Id.; see also Burger King, 471 U.S. at 475 (citing Helicopteros, 466 U.S. at 417).  In a contract case, "the place where the contract is to be performed" may be "a weighty consideration" in determining jurisdiction.  Command-Aire Corp. v. Ontario Mech. Sales and Serv. Inc., 963 F.2d 90, 94 (5th Cir. 1992).  However, "[i]f . . . the forum plaintiff's decision to perform [his] contractual obligations within [his] own forum state is totally unilateral, it cannot be viewed as purposeful on the part of the nonresident and the weight is necessarily diminished."  Id.  In the present case, Elliott's performance of work for Armor Holdings at his New Hampshire residence resulted entirely from Elliott's unilateral decision to acquire a residence in New Hampshire and to work at

-35-

his home office.  As noted above, Armor Holdings did not request,

require, or authorize Elliott to work at his New Hampshire home

or anywhere else in New Hampshire.  See Spiller Aff. ¶ 19;

Spiller Reply Aff. ¶ 8.  Because Elliot's performance of work in

New Hampshire was based on a unilateral decision that he made for

his own convenience, without any action on Armor Holdings's part,

he has failed to show voluntariness.[10]

---

[10]  I have already determined that the correspondence that
Armor Holdings had with Elliott in New Hampshire (as well as any
telephone calls that Armor Holdings may have made to Elliott's
New Hampshire home) are not related to the formation or breach of
any agreement between the parties.  I note here that these
isolated and attenuated communications do not constitute a
purposeful availment of the privilege of conducting activities in
New Hampshire.  See Massachusetts Sch. of Law, 142 F.3d at 36
(concluding that defendant's participation in telephone
conversation with in-forum person and subsequent mailing into
forum, combined with participation in meeting in forum, were
"insufficient to establish purposeful availment"); U.S.S. Yachts,
Inc. v. Ocean Yachts, Inc., 894 F.2d 9, 11, 12 (1st Cir. 1990)
(concluding that three letters sent into forum by defendant were
insufficient to support personal jurisdiction over defendant);
Kerry Steel, 106 F.3d at 151 (finding defendant's telephone calls
and letters into forum state to be "precisely the sort of
'random,' 'fortuitous' and 'attenuated' contacts that the Burger
King Court rejected as a basis for haling non-resident defendants

Moreover, "[e]ven if a defendant's contacts with the forum are deemed voluntary, the purposeful availment prong of the jurisdictional test investigates whether the defendant benefitted from those contacts in a way that made jurisdiction foreseeable." Phillips Exeter, 196 F.3d at 292 (citing Ticketmaster, 26 F.3d at 207). An exercise of personal jurisdiction over a nonresident defendant is foreseeable, and therefore appropriate, "where the defendant purposefully derives economic benefits from its forum-state activities," Nowak, 94 F.3d at 717, or makes "a purposeful decision . . . to 'participate' in the local economy." Bond Leather, 764 F.2d at 934. Similarly, the assertion of personal jurisdiction over a nonresident defendant is foreseeable when that defendant has reached out to establish a continuing relationship or obligation between itself and a resident of the forum state. See Burger King, 471 U.S. at 473, 476; Sawtelle, 70

into foreign jurisdictions") (quoting LAK, Inc. v. Deer Creek Enters., 885 F.2d 1293, 1301 (6th Cir. 1989) (internal quotation marks omitted)).

F.3d at 1393.

In the present case, there is no evidence that Armor Holdings purposefully derived any economic benefit or did any business in New Hampshire in relation to Elliott's employment.[11] Nor is there any indication that Armor Holdings intentionally reached out to New Hampshire to establish continuing obligations or relationships with residents of the state. Elliott has not produced any evidence that he was a New Hampshire resident at the time he and Armor Holdings entered into any contractual relationship. Rather, the record indicates that Elliott established his New Hampshire residence only after he and Armor Holdings entered into the 1997 agreement, the final contract between the parties. See Elliott Aff. ¶¶ 2, 10. The jurisdictional evidence establishes that Elliott, acting on his

_____

[11] While Elliott has produced evidence that representatives of Armor Holdings advertised, marketed, and sold products manufactured by the company's subsidiaries in New Hampshire, these activities bear no relation to Elliott's duties, which involved business operations, not sales. See Spiller Aff. ¶ 6.

own initiative, sometimes performed work for Armor Holdings at the New Hampshire residence he established after entering into his final contract with the company. Based on these facts, Armor Holdings could not have foreseen that it would be subject to suit in New Hampshire in an action relating to Elliott's services or compensation. Accordingly, I conclude that Elliott has failed to demonstrate foreseeability.

Because Elliott has not made a prima facie showing of either voluntariness or foreseeability, he has not met the purposeful availment requirement for personal jurisdiction. Having determined that Elliott has failed to make the required showing under both the relatedness requirement and the purposeful availment requirement, I need not address the final element of the personal jurisdiction test. See Phillips Exeter, 196 F.3d at 288, 292. Accordingly, I conclude that I lack the authority to exercise specific jurisdiction over Armor Holdings.

B.   General Jurisdiction

A court may assert general jurisdiction over a defendant even when the plaintiff's claim is not related to the defendant's forum-based conduct, if the defendant has engaged in "the 'continuous and systematic' pursuit of general business activities in the forum state." Glater v. Eli Lilly & Co., 744 F.2d 213, 216 (1st Cir. 1984) (citing Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 448 (1952)); see also Helicopteros, 466 U.S. at 415-16; Massachusetts Sch. of Law, 142 F.3d at 34. In other words, although an exercise of general jurisdiction does not require relatedness, it does require that the defendant's contacts with the forum state be much more extensive than the "minimum contacts" necessary for specific jurisdiction. See Donatelli, 893 F.2d at 463 (noting that "'[a]lthough minimum contacts suffice in and of themselves for specific jurisdiction . . . , the standard for general jurisdiction is considerably more stringent'") (quoting Glater, 744 F.2d at 216) (alteration in original).

Because relatedness is not germane to general jurisdiction, I must consider all of Elliott's jurisdictional facts when assessing whether this court may exercise general jurisdiction over Armor Holdings. As described in detail above, Elliott has produced (1) evidence that he performed some work activities for Armor Holdings at his New Hampshire home; (2) evidence that sales representatives acting for Armor Holdings advertised, marketed, and sold in New Hampshire products manufactured by Armor Holdings's wholly-owned subsidiaries; and (3) evidence that Armor Holdings acquired Safariland, a company that sold its products in New Hampshire. I consider the second and third categories of evidence first, then turn to the first.

The First Circuit's decisions in analogous cases demonstrate that a nonresident defendant that advertises and uses sales representatives in a forum state but sells an insubstantial amount of its products in the forum state is not engaged in the type of continuous and systematic activity that would subject it

to general jurisdiction in the forum.  See, e.g., Noonan v.

Winston Co., 135 F.3d 85, 92-94 (1st Cir. 1998) (holding that

regular solicitations of business from forum-state companies,

travel to forum state to develop business relationship with local

company, and approximately $585,000 of in-state orders were not

sufficient to authorize general jurisdiction); Glater, 744 F.2d

at 215, 217 (concluding that advertising in trade journals

circulated in state, employment of eight sales representatives in

state, and sale of products to distributors in state were not

sufficient to support general jurisdiction); Seymour v. Parke,

Davis & Co., 423 F.2d 584, 585, 587 (1st Cir. 1970) (concluding

that employment of approximately six salesmen in state and

advertisement in state were insufficient to support general

jurisdiction).  In light of these precedents, I conclude that

Armor Holdings use of sales representatives to sell to New

Hampshire purchasers a relatively small amount of the products

manufactured by its subsidiaries, combined with the acquisition

of Safariland, does not constitute the continuous and systematic

pursuit of general business activities in New Hampshire.[12]

Elliott also seeks to add the work that he performed for Armor Holdings at his New Hampshire residence to the calculus of contacts for general jurisdiction. This effort is unavailing. First, I have already determined that Elliott's use of his home office to engage in work for Armor Holdings was a unilateral action that does not constitute a purposeful "minimum contact" with New Hampshire by Armor Holdings. Therefore, Elliott's New Hampshire activities cannot be considered in the calculation of general jurisdiction. Second, even in combination with the other evidence of Armor Holdings's New Hampshire activities, Elliott's performance of work in New Hampshire does not lift his jurisdictional claim to the high standard required for an assertion of general jurisdiction.

---

[12] The parties have devoted substantial energy to disputing whether New Hampshire activities of Armor Holdings's subsidiaries are attributable to the parent company. This issue is not relevant to the jurisdictional analysis in this case because Elliott has produced evidence that supports a reasonable inference that the sales representatives who sold the subsidiaries' products were acting for Armor Holdings. Accordingly, I need not address the question of veil-piercing and attribution.

Accordingly, I conclude that Elliott has failed to make the showing necessary for an exercise of general jurisdiction over Armor Holdings.

## IV.  Conclusion

Because Elliott has failed to satisfy the requirements of relatedness and purposeful availment, I cannot exercise specific jurisdiction over Armor Holdings.  Moreover, because Armor Holdings is not engaged in continuous and systematic activities in New Hampshire, I cannot assert general jurisdiction over the company.  Accordingly, Armor Holdings's motion to dismiss (Doc. #5) is granted.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge


January 12, 2000

cc:   Tara Connors Schoff, Esq.
      Peter S. Cowan, Esq.