GANIS CORPORATION OF
CALIFORNIA, Plaintiff,
Appellee,

v.

Neil D. JACKSON and Ann E. Jackson,
Defendants, Appellants.

No. 86–1571.

United States Court of Appeals,
First Circuit.

Argued Oct. 6, 1986.

Decided June 29, 1987.

Stephen A. Hopkins, Paul Killeen, Miriam R. Goldstein and Sherburne, Powers & Needham, Boston, Mass., were on brief, for defendants, appellants.

Charles R. Dougherty with whom Hill & Barlow, Boston, Mass., was on brief for plaintiff, appellee.

Before COFFIN, Circuit Judge, BROWN,* Senior Circuit Judge, and BREYER, Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge.

This case presents a classic question of personal jurisdiction. Defendants-appellants Neil and Ann Jackson (Jacksons) appeal from the District Court's denial of their motion to vacate a judgment obtained against them by Ganis Corporation of California (Ganis), 635 F.Supp. 311. The Jacksons financed the purchase of a boat through Ganis. Upon default of the note, Ganis brought suit and obtained a default judgment in the United States District Court for the Central District of California. Ganis then brought the judgment to the District Court of Massachusetts for registration, seeking to execute on the Jacksons' home. The Jacksons[1] challenge this execution on the ground that the judgment rendered in California was void for lack of personal jurisdiction. After submission of affidavits, memoranda, and an oral hearing, Chief Judge Caffrey denied the Jacksons' motion to vacate the judgment. Based on the United States Supreme Court's ruling in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), we hold that the exercise of long-arm jurisdiction did not offend the due process clause of the fourteenth amendment of the United States Constitution and affirm the District Court's decision.

### The Boat that Couldn't Float

Neil and Ann Jackson are residents of Massachusetts. Ganis Corporation is a California loan brokerage. Basically, the Jacksons obtained a loan from Ganis to invest in a tax shelter yacht scheme in Florida. Paul Garfinkel, a Florida tax at-torney and long-time financial advisor to the Jacksons, approached them with this deal in early 1984. According to the plan, the Jacksons would purchase the yacht. The boat would then be leased back to Garfinkel's firm, Inter Island Charters, Inc. The debt service on the loan was to be paid out of funds generated from charter parties of the boat made through Inter Island.

Later in 1984, Garfinkel contacted Seagate, Inc., a Texas company, to help arrange the loan necessary to finance the purchase. Seagate, in turn, approached Ganis for funds. While Ganis primarily lends to corporate institutions, occasionally it lends money to individuals, such as the Jacksons. Late in November 1984, Ganis sent to the Jacksons' bank in Massachusetts a set of loan documents for the Jacksons' signatures. The bank sent the documents back because they were not properly completed.

In early December 1984, Ganis sent out a second set of loan documents. This time, Ganis sent the documents to Seagate, which forwarded them to the Jacksons. Each of the loan documents clearly identified Ganis as a California lender. All of the documents were on Ganis' letterhead or its pre-printed forms. All the Ganis documents listed the company's address as Newport Beach, California. The Jacksons signed the documents, sent them to Garfinkel, who then returned them to Ganis in California sometime between December 15th and December 21st, 1984.

The documents included (i) a Note in the amount of $405,600, which provided for monthly installment payments over a five-year period to be made to Ganis "at its main office in Newport Beach, California"; (ii) a security agreement that provided that the agreement "shall be governed by the laws of California"; (iii) a California commercial code (UCC-1) Financing Statement, and (iv) a "Notice of Buyer Acceptance of Marine Vessel," which warranted that the

---

* Of the Fifth Circuit, sitting by designation.

**1.** On March 18, 1987, the Jacksons filed for federal bankruptcy protection pursuant to Chapter 11. On April 24, the bankruptcy court, by agreed order, granted Ganis' motion for relief from the automatic stay. 11 U.S.C. § 362 (1979 & Supp.1987). The stay having been lifted, we are free to decide this case without reference to bankruptcy law considerations.

Jacksons had received the boat in good condition and accepted it "without qualification."[2]

In reliance on the executed documents, Ganis borrowed $405,600 from another bank in order to make the loan to the Jacksons. To double check on the deal, Ganis' credit manager, Peter Ceglio, called Neil Jackson at his home in Massachusetts and reviewed the terms of the loan with Jackson. During the course of the call, Jackson confirmed that the boat had been delivered and was satisfactory, but stated that Garfinkel was "more familiar" with the deal than he. Ganis then mailed to Trans-Caribe Yacht, Inc.[3] in Coral Gables, Florida, a check in the amount of $390,000 as the purchase money for the Jacksons' boat. Ganis and Seagate split the $15,600 balance as their loan fee.

Trouble, however, was not far behind. When the first loan payment was not made on time, Ganis again contacted Neil Jackson. Jackson directed the company to contact Garfinkel. The payment was eventually made by one of Garfinkel's "advisor" colleagues in Florida.

In late January 1985, Ganis learned that the boat did not exist. The yacht was nothing more than an aluminum hull, which was not and never has been finished out. The Jacksons' signatures on the "Notice of Buyer Acceptance of Marine Vessel," verifying that the boat was "in good condition" and was accepted "without qualification" were worthless. Somewhat piqued, Ganis accelerated the terms of the Note and demanded full payment of the loan.

On March 8, 1985, Ganis filed suit against the Jacksons in federal district court in California, seeking to collect the principal amount of $405,600 following the Jacksons' default on that Note. The Jacksons were properly served but elected not

to appear or answer, either generally or specially.[4] Accordingly, on July 23, 1985, the California court entered a default judgment in the amount of $437,658.05 against the Jacksons.

On November 7, 1985, Ganis registered the judgment in the District Court of Massachusetts. The same day, the District Court issued an execution against the Jacksons. The Jacksons then brought a motion to vacate the judgment pursuant to F.R. Civ.P. 60(b)(4), contending that the judgment was void for want of personal jurisdiction. The District Court denied the Jacksons' motion for relief on May 19, 1986.

This appeal follows.

### Burger King: The Jurisdictional Whopper

The Jacksons have steadfastly maintained that the California court lacked personal jurisdiction over them and that therefore any subsequent enforcement proceeding on the opposite coast was null and void. In a diversity case, a federal court will look to state law when deciding whether to exercise personal jurisdiction over a nonresident defendant. *Ealing Corp. v. Harrods, Ltd.*, 790 F.2d 978, 981 (1st Cir.1986); *Kowalski v. Doherty, Wallace, Pillsbury & Murphy*, 787 F.2d 7, 9 (1st Cir.1986); *Gray v. O'Brien*, 777 F.2d 864, 866 (1st Cir.1985) (per curiam). California's long-arm statute governs whether the California District Court had personal jurisdiction over the Jacksons.[5] The California long-arm statute is coextensive with the limits of constitutional due process. Our examination, then, is an inquiry into whether the requirements of the fourteenth amendment have been met. *Haisten v. Grass Valley Medical Reimbursement Fund*, 784 F.2d 1392, 1396 (9th Cir.1986) (California and federal limits of personal jurisdiction are coextensive);

---

**2.** In fact, the Jacksons had never seen the boat. Such verification was clearly made knowing it not to be true.

**3.** Trans-Caribe was apparently one of Garfinkel's ventures.

**4.** At oral argument, the Jacksons' counsel stated that this decision, not to appear at all, was a

"strategic" one, made knowingly and on his advice.

**5.** Section 410.10 provides:

A court of this state may exercise jurisdiction on any basis not inconsistent with the constitution of this state or of the United States. Cal.Civ.Proc.Code § 410.10 (West 1973).

*see Brand v. Medlove Dodge,* 796 F.2d 1070, 1073 (9th Cir.1986) (since California imposes no greater restrictions than does the United States Constitution, federal courts in California may exercise jurisdiction to the fullest extent permitted by due process). The United States Supreme Court has not, and refuses to, set down any mechanical or automatic test to determine whether a court's exercise of jurisdiction over a nonresident party is violative of the due process clause. "We ... reject any talismanic jurisdictional formulas; 'the facts of each case must [always] be weighed' in determining whether personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King,* 471 U.S. at 485–86, 105 S.Ct. at 2189, 85 L.Ed.2d at 549.

It is now axiomatic that any examination of the constitutionality of an exercise of a state's long-arm jurisdiction first stops at the "minimum contacts" requirement set down in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).[6] "[T]he 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite 'affiliating circumstances' are present.... We recognize that this determination is one in which few answers would be written 'in black and white. The grays are dominant and even among them the shades are innumerable.'" *Kulko v. California Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132, 141 (1978) (citations omitted).

From there, the inquiry runs to "the foreseeability that is critical to the due process analysis": whether or not "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v.*

*Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980). When trying to establish jurisdiction, the plaintiff must identify "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183, 85 L.Ed.2d at 542, quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

■ In short, the Jacksons cannot knowingly avail themselves of the benefits of interstate commerce, even if it is through the use of agents, without also subjecting themselves to the corresponding obligations of such a bi-coastal transaction.[7]

■ Certainly, the mere fact that an individual in Massachusetts executes a contract with a person in California does not automatically constitute sufficient contacts so as to confer a finding of personal jurisdiction. Indeed, the Supreme Court, in its most recent discourse on personal jurisdiction, adopts a "contract-plus" analysis. *Burger King,* 471 U.S. at 479, 105 S.Ct. at 2185, 85 L.Ed.2d at 545 (a contract is ordinarily an intermediate step serving to tie up prior business negotiations with future consequences); *see also Bond Leather Co. v. Q.T. Shoe Manufacturing Co.,* 764 F.2d 928, 933 (1st Cir.1985). Under this type of analysis, the court is to look at all of the communications and transactions between the parties, before, during and after the consummation of the contract, to determine the degree and type of contacts the defend-

---

**6.** [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice".
*International Shoe,* 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 102, quoting *Milliken v. Meyer,*

311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278, 283 (1940).

**7.** Because we affirm the trial court's finding of jurisdiction from a traditional analysis of the record, we do not express any opinion on the merits of any agency or sub-agency argument.

ant has with the forum, apart from the contract alone.

■ The Jacksons have conceded the "contract" half of the "contract-plus" analysis; the "plus" factors are readily apparent from the record. For example, the installment note signed by the Jacksons requires payments to be made over a five-year period to Ganis at its office in Newport Beach, California. The location of where payments are to be sent has been recognized as a material contact in jurisdictional analysis. *Burger King,* 471 U.S. at 480–81, 105 S.Ct. at 2186, 85 L.Ed.2d at 546; *see O'Hare International Bank v. Hampton,* 437 F.2d 1173, 1177 (7th Cir. 1971). The security agreement signed by the Jacksons contained a choice of laws provision which stated that California law would govern the transaction. While not conclusive, this contract provision further tips the scales in favor of Ganis since a contractual provision adopting a forum state's laws combined with the five-year duration of the relationship "reinforce[s] [the nonresident defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." *Burger King,* 471 U.S. at 482, 105 S.Ct. at 2187, 85 L.Ed.2d at 547.

In addition to the note and the security agreement, other documents, including the notice to the borrowers, the itemized statement of the financing, and the truth in lending disclosure statement were all made on Ganis forms. All bore clearly the California address of Ganis. The Jacksons also signed the California UCC–1 financing statement.

■ Further, the Jacksons executed a "Notice of Buyer's Acceptance of Marine Vessel." Basically, this notice acts as an acknowledgment of satisfactory receipt. In this case, of course, the acknowledgment was baseless, at best. The transmittal of such a misrepresentation, even if unwitting, has been held to represent substantial contacts for the purpose of finding personal jurisdiction. *Ealing Corp. v. Harrods, Ltd.,* 790 F.2d 978, 983 (1st Cir. 1986) (analogizing a misrepresentation sent into a forum state with "the frequently hypothesized but rarely encountered gunman firing across a state line"); *Murphy v. Erwin-Wasey, Inc.,* 460 F.2d 661, 664 (1st Cir.1972).

### The Hull is Sunk

■ We take our cue from the Supreme Court. "[P]rior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing ... must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King,* 471 U.S. at 479, 105 S.Ct. at 2186, 85 L.Ed.2d at 545. Although the Jacksons may have relied on their advisor Garfinkel, they cannot avoid the legal consequences of their actions, taken knowingly and on advice of counsel. The realization twenty years ago of the "increasing nationalization of commerce" becomes only more significant with each passing year. *McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 21 L.Ed.2d 223, 226 (1957). The modern transportation and communication systems that allowed the Jacksons to obtain financing in the manner in which they did also make "it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Id.* The Jacksons expressly entered this relationship with an eye to obtaining a substantial economic benefit in the form of tax savings. That benefit, however, was contingent upon obtaining the loan from Ganis to finance the boat. The fact that the deal eventually soured and that the Jacksons did not receive the expected benefit is immaterial to this threshold inquiry into whether personal jurisdiction was present. The Jacksons, through the contract and surrounding events, established sufficient contacts with California to make a finding of jurisdiction proper.

AFFIRMED.