WPI Electronics v. Super Vision        CV-99-426      01/27/00

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


WPI Electronics, Inc.

    v.                                    Civil No. C-99-426-B
                                      Opinion No. 2000 DNH 023
Super Vision International, Inc.



MEMORANDUM AND ORDER



In this action, WPI Electronics, Inc. ("WPI"), sued its customer, Super Vision International, Inc. ("Super Vision") for breach of contract and breach of the covenant of good faith and fair dealing.  Super Vision moved to dismiss WPI's action for lack of personal jurisdiction, claiming that it was a mere "passive purchaser" of goods from WPI with no other contacts with New Hampshire.  Because the record would support a conclusion that Super Vision had sufficient contacts with WPI in New Hampshire to subject it to personal jurisdiction in this court, I deny Super Vision's motion.

# I. BACKGROUND

WPI is a New Hampshire corporation with its principal place of business in Warner, New Hampshire. It manufactures power conversion devices, including electronic ballasts for use in lighting systems. WPI's one production facility is located in New Hampshire. Aff. of F. Marshall Mayer ¶ 2 [hereinafter Mayer Aff.]. Super Vision is a Florida corporation with its principal place of business in that state. Super Vision manufactures fiber optic lighting products, which use ballasts as a component. Aff. of Brett Kingston ¶ 2, 4 [hereinafter Kingstone Aff.].

The parties first dealt with each other in 1996, when Super Vision purchased 500 "SafeArc" ballasts from WPI for $177,500. The ballasts were shipped in installments over a ten month period beginning in March 1996 and ending in December 1996. Aff. of Paul D. Iverson ¶ 2 [hereinafter Iverson Aff.]. In December 1996, Super Vision sent WPI a new purchase order for additional shipments of "SafeArc" ballasts. From January 1997 until February 1998, WPI shipped Super Vision 350 ballasts for a total purchase price of $124,250. Id. ¶ 3.

In March 1998, Marshall Mayer, WPI's Regional Sales Manger for the Southern Region, learned that Super Vision was developing a new lighting project and approached Super Vision about the possibility of WPI supplying the ballasts for the project. Mayer Aff. ¶ 3. During the spring and summer of that year, Mayer and others from WPI communicated regularly with Super Vision regarding its project. See id. ¶¶ 3, 4, 5.

On October 2, 1998, WPI issued a price quotation in which it offered to sell Super Vision various types and quantities of ballasts and ignitors. WPI planned to ship the products in installments over a period beginning in February 1999 and ending in December 1999. Id. ¶ 6. During the following weeks, Super Vision gave WPI more precise information regarding its ballast and ignitor needs. Id. ¶ 7. In response, WPI faxed a revised price quotation for "FlexArc"[1] ballasts and ignitors to Super

---

[1] According to WPI, its "SafeArc" and "FlexArc" ballasts are similar. Both use a voltage doubler front end with a "buck converter" topology to convert the AC power from the wall socket to power than can drive an arc lamp. The two products use a similar circuit design, but the "FlexArc" design is more modern, cost effective, and compact than the "SafeArc" design. Iverson

Vision's Florida location.  In this price quotation, WPI proposed shipping the ballasts and ignitors in installments over a period of approximately two years.  Id.

After the two sides discussed changes to the price quotation, Super Vision faxed a purchase order to WPI's New Hampshire facility for 11,060 ballasts with ignitors to be delivered in installments over a period of approximately two years.  Deliveries were to begin in February 1999.  The total purchase price for the order was $1,772,000.  Id. ¶ 11.  The parties engaged in further negotiations regarding the terms of Super Vision's purchase order.  As a result, Super Vision faxed a revised purchase order to WPI's New Hampshire facility on November 25, 1998.  The revised purchase order altered the quantity to be shipped during certain months, changed the delivery dates, and expressly stated that the order was contingent upon WPI's acceptance of certain attached conditions, including Super Vision's acceptance of WPI's new designs.  See

Aff. ¶ 4.

id. ¶ 12, Ex. I.

Once the parties reached an agreement, Super Vision became actively involved in WPI's development of the ballasts and ignitors. Representatives from both companies communicated extensively about technical and cost aspects of the ballasts and ignitors; these discussion in turn led to the final design of the products. WPI also (1) made regular progress reports to Super Vision regarding the performance of the products, (2) shipped samples for Super Vision to test, and (3) met in person with a Super Vision representative to discuss technical and cost aspects of the project. Id. ¶ 13. As a result of these continued communications, the parties agreed to make further changes to Super Vision's revised purchase order. See id.

In late 1998, Super Vision began to report testing issues with WPI's ballasts. Id. ¶ 15. The parties worked together to resolve these perceived technical problems. In addition to exchanging written and oral communications, primarily by email and telephone, a Super Vision representative traveled to WPI's

production facility in New Hampshire.  Id.

The parties' relationship began to break down during the summer of 1999.  In a letter dated August 26, 1999, Super Vision informed WPI that it was terminating their contract and demanded a full refund of monies it had paid to date.  See id. ¶ 16.  On September 10, 1999, Super Vision, through its attorneys, renewed its demand for full repayment.  See id.  WPI refused Super Vision's demand.  Instead, it filed this action on September 13, 1999.  On September 30, 1999, Super Vision filed a multi-count complaint against WPI in the United States District Court for the Middle District of Florida.  Kingstone Aff. ¶ 16.

## II.  STANDARD OF REVIEW

When a defendant challenges a forum court's exercise of personal jurisdiction, the plaintiff bears the burden of establishing that personal jurisdiction exists.  See Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998); Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995); Foster-Miller, Inc. v. Babcock &

-6-

Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995); United
Electrical, Radio and Machine Workers v. 163 Pleasant St. Corp.,
960 F.2d 1080, 1090 (1st Cir. 1992) [hereinafter Pleasant St. I],
appeal after remand, 987 F.2d 39 (1st Cir. 1993).  If no
evidentiary hearing is held on a motion to dismiss for lack of
personal jurisdiction, the plaintiff ordinarily must establish
the existence of personal jurisdiction according to a prima facie
standard.  See Sawtelle, 70 F.3d at 1386 n. 1.

Under this standard, I look to the facts alleged in the
pleadings and the parties' supplemental filings, including
affidavits.  Id. at 1385.  I take facts affirmatively alleged by
the plaintiff as true and construe them in the light most
favorable to the plaintiff's jurisdictional claim.  See
Massachusetts Sch. of Law, 142 F.3d at 34; Sawtelle, 70 F.3d at
1385.  I then consider uncontradicted facts presented by the
defendant.  See Massachusetts Sch. of Law, 142 F.3d at 34.
Although liberal, this standard does not require a court to
"credit conclusory allegations or draw farfetched inferences."

Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 203 (1st Cir. 1994); see also Massachusetts Sch. of Law, 142 F.3d at 34.


## III.  DISCUSSION

### A.  Statutory and Constitutional Requirements

To be entitled to exercise personal jurisdiction over a defendant, a court must find sufficient contacts between the defendant and the forum to satisfy both the state's long arm statute and the due process clause of the Fourteenth Amendment. See Sawtelle, 70 F.3d at 1387; Ticketmaster-New York, Inc., 26 F.3d at 204.

Section 293-A:15.10 of the New Hampshire Business Corporation Act has been recognized as the long arm statute applicable to foreign corporations. See N.H. Rev. Stat. Ann. § 293-A:15.10 (Supp. 1998); see also McClary v. Erie Engine & Mfg. Co., 856 F. Supp. 52, 55 (D.N.H. 1994). This long arm provision has been interpreted to authorize jurisdiction over a foreign corporation to the full extent permitted by the federal constitution. See Sawtelle, 70 F.3d at 1388; McClary, 856 F.

Supp. at 55.  Because New Hampshire's long arm statute is coextensive with the limits of due process, this two part inquiry collapses into a single inquiry as to whether the due process requirements have been met.  See Sawtelle, 70 F.3d at 1388; McClary, 856 F. Supp. at 55.

B.    General Principles of Personal Jurisdiction

The ultimate objective of the due process "minimum contacts" standard is to ensure that the forum's exercise of personal jurisdiction over a nonresident defendant does not offend "'traditional notions of fair play and substantial justice.'" Pleasant St. I, 960 F.2d at 1087 (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  As long as a defendant has at least one meaningful contact with the forum, the exercise of personal jurisdiction is constitutionally proper.  See Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 717 (1st Cir. 1996) (citing McGee v. International Life Ins. Co., 355 U.S. 220, 223 (1957)); Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994).

There are two forms of personal jurisdiction.  If a defendant maintains continuous and systematic contacts with the

forum state, then the forum court has general jurisdiction.  See

Phillips Exeter Academy v. Howard Phillips Fund, Inc., 196 F.3d

284, 288 (1st Cir. 1999).  Specific jurisdiction exists if there

is "a demonstrable nexus between a plaintiff's claims and a

defendant's forum-based activities."  Massachusetts Sch. of Law,

142 F.3d at 34.  That is, a forum court may exercise specific

jurisdiction if the plaintiff's case "relates sufficiently to, or

arises from, a significant subset of contacts between the

defendant and the forum."  Phillips Exeter Academy, 196 F.3d at

288; see also Pleasant St. I, 960 F.2d at 1088-89.  In this case,

WPI argues that the court has specific personal jurisdiction over

Super Vision.

The First Circuit has developed a three-prong test —
relatedness, purposeful availment, and reasonableness — for
assessing whether a forum may exercise specific jurisdiction.
See Pleasant St. I, 960 F.2d at 1089 (announcing three part test
for specific jurisdiction).

The relatedness prong examines whether the plaintiff's claim

"directly relates to or arises out of the defendant's contacts with the forum." Phillips Exeter Academy, 196 F.3d at 288. It is intended to focus "the court's attention on the nexus between a plaintiff's claim and the defendant's contacts with the forum." Sawtelle, 70 F.3d at 1389 (internal quotation marks and citations omitted). Relatedness is intended to be a flexible and relaxed standard. See id.; Pritzker, 42 F.3d at 61. In a contract case, relatedness is established if the defendant's contacts with the forum "were instrumental either in the formation of the contract or in its breach." Phillips Exeter Academy, 196 F.3d at 289; see also Massachusetts Sch. of Law, 142 F.3d at 35 (formation of contract).

Under the First Circuit's tripartite test, I next examine whether the defendant, by its contacts with the forum, purposefully availed itself of the "benefits and protections afforded by the forum's laws." Phillips Exeter Academy, 196 F.3d at 288; see also Pleasant St. I, 960 F.2d at 1089. The purposeful availment requirement is intended to protect an out-

of-state defendant from the forum's exercise of personal jurisdiction based upon the defendant's "'random, isolated, or fortuitous' contacts with the forum state." Sawtelle, 70 F.3d at 1391 (quoting Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 774 (1984)). Accordingly, the First Circuit requires that both voluntariness and foreseeability be demonstrated to satisfy the purposeful availment prong. See id.; Ticketmaster-New York, Inc., 26 F.3d at 207.

For a defendant's contacts with the forum to be deemed voluntary, they must not be based upon "the unilateral actions of another party or a third person." Nowak, 94 F.3d at 716. In addition, the defendant's contacts must be such that the defendant would "reasonably anticipate being haled into court there." Id. The forum's exercise of personal jurisdiction is deemed foreseeable if the out-of-state defendant establishes a "continuing obligation between itself and the forum state." Sawtelle, 70 F.3d at 1393.

In a contract action, the mere existence of a contractual

relationship between a forum plaintiff and an out-of-state defendant is insufficient to establish purposeful availment. See Phillips Exeter Academy, 196 F.3d at 290; Ganis Corp. v. Jackson, 822 F.2d 194, 197 (1st Cir. 1987). Rather, using a "contract-plus" analysis, see Ganis Corp., 822 F.2d at 197, I must consider additional factors, including: "(1) the prior negotiations between the parties and the contemplated future consequences of the [contract]; (2) the terms of [the contract]; and (3) the parties' actual course of dealing." U.S.S. Yachts, Inc. v. Ocean Yachts, Inc., 894 F.2d 9, 12 (1st Cir. 1990); Ganis Corp., 822 F.2d at 197-98.

The third prong of the specific jurisdiction analysis focuses on the reasonableness of the forum's exercise of jurisdiction. In particular, reasonableness is assessed "in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction." Phillips Exeter Academy, 196 F.3d at 288. The First Circuit identifies five fairness considerations, which it has dubbed the "gestalt"

factors: "(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; (5) and the common interests of all sovereigns in promoting substantive social policies." Sawtelle, 70 F.3d at 1394; see also Pleasant St. I, 960 F.2d at 1088.

## C.    Passive Purchaser Doctrine

Concerns about the propriety of exercising personal jurisdiction over an out-of-state defendant are particularly acute when a defendant has been sued because it is a purchaser of goods produced in the forum state.  Courts traditionally have distinguished between out-of-state sellers and out-of-state buyers.  See In-Flight Devices Corp. v. Van Dusen Air, Inc., 466 F.2d 220, 232-33 (6th Cir. 1972) (noting courts have made this distinction in applying long arm statute).  This distinction has been described as "short-hand" for differentiating out-of-state defendants who were active parties to transactions with forum

plaintiffs from those who were passive parties to such transactions.  See id. at 233.  The First Circuit shares this concern about protecting "'wholly passive purchasers who do no more than place an order with an out of state merchant and await delivery.'" Howell Labs., Inc. v. Clear Channel Communications, Inc., 751 F. Supp. 258, 260 (D. Me. 1990) (quoting Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 931-32 (1st Cir. 1985)).

In an action brought by a forum seller against an out-of-state purchaser, I must determine whether the out-of-state purchaser was sufficiently involved in the transaction to render the forum's exercise of personal jurisdiction constitutional. See Bond Leather Co. v. Q.T. Shoe Mfg. Co., 764 F.2d 928, 933-34 (1st Cir. 1985).  If the out-of-state purchaser sufficiently departed from the role of a passive purchaser, then the unfairness usually associated with exercising personal jurisdiction over such a defendant is eliminated.  See In-Flight Devices Corp., 466 F.2d at 233 (long arm statute).

Courts, either expressly or impliedly, have recognized

several factors to distinguish a passive purchaser from an active purchaser, including:

(1) which party, buyer or seller, initiated the transaction, see Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co., 75 F.2d 147, 149, 152 & n. 5 (3d Cir. 1996) (no personal jurisdiction); Strick Corp. v. A.J.F. Warehouse Distribs., Inc., 532 F. Supp. 951, 958, 959 (E.D. Pa. 1982) (personal jurisdiction existed);

(2) the extent to which the purchaser negotiated the terms of the transaction with the seller, see In-Flight Devices Corp., 466 F.2d at 233 (personal jurisdiction existed);

(3) the location of the negotiations, see Vetrotex Certainteed Corp., 75 F.2d at 149, 151, 152 (no personal jurisdiction); Sybaritic, Inc. v. Interport Int'l, Inc., 957 F.2d 522, 523, 525 (8th Cir. 1992) (no personal jurisdiction); Strick Corp., 532 F. Supp. at 958, 959 (personal jurisdiction existed);

(4) the terms of the contract, including provisions identifying the governing law, the place of performance, and the

place of payment, see Vetrotex Certainteed Corp., 75 F.2d at 149, 151 (no personal jurisdiction); Sybaritic, Inc., 957 F.2d at 525 (no personal jurisdiction); Strick Corp., 532 F. Supp. at 958, 959; cf. Ganis Corp., 822 F.2d at 198 (personal jurisdiction existed);

(5) whether the parties had prior dealings, and the proximity in time of those prior dealings to the disputed transaction, see Vetrotex Certainteed Corp., 75 F.2d at 149, 153 (no personal jurisdiction); Howell Labs., Inc., 751 F. Supp. at 261 (personal jurisdiction existed);

(6) whether the seller conformed the goods to the buyer's specifications, see Whittaker Corp. v. United Aircraft Corp., 482 F.2d 1079, 1084 (1st Cir. 1973) (personal jurisdiction existed with respect to one defendant, but not others); Howell Labs., Inc., 751 F. Supp. at 261 (personal jurisdiction existed);

(7) the product's degree of complexity, see Howell Labs., Inc., 751 F. Supp. at 261 n. 2 (personal jurisdiction existed); Strick Corp., 532 F. Supp. at 958, 959 (personal jurisdiction

existed).

(8) whether the buyer supervised or participated in the seller's performance, see Whittaker Corp., 482 F.2d at 1084 (personal jurisdiction existed with respect to one defendant, but not others); and

(9) whether the parties, after the formation of the contract, continued to communicate with each other, including visits to the seller's manufacturing site by the buyer, see Vetrotex Certainteed Corp., 75 F.2d at 152-53 (no personal jurisdiction); Whittaker Corp., 482 F.2d at 1084 (personal jurisdiction existed with respect to one defendant, but not others); In-Flight Devices Corp., 466 F.2d at 233 (personal jurisdiction existed); Howell Labs., Inc., 751 F. Supp. at 261 personal jurisdiction existed).

In view of these considerations, I now turn to assessing Super Vision's contacts with New Hampshire.

## D.    Is Super Vision a Passive Purchaser?

WPI maintains that this court has specific jurisdiction because Super Vision was an active participant in their

transaction. Pl.'s Mem. of Law. in Opp'n. to the Mot. of Super Vision International, Inc. to Dismiss for Lack of Personal Jurisdiction at 5 n.2 (doc. no. 8). Super Vision counters that its contacts with New Hampshire were so few that it is constitutionally impermissible for this court to exercise even specific jurisdiction. See [Def.'s] Mem. of Law in Supp. of Def.'s Mot. to Dismiss for Lack of Jurisdiction at 14 (doc. no. 5). I examine this dispute in light of the tripartite test for specific personal jurisdiction.

1. Relatedness

In the present case, the relatedness prong of the specific jurisdiction test is easily satisfied. As discussed below, Super Vision participated in the formation of the sales contract between it and WPI. Its participation included communications, by telephone, fax, and mail, directed into New Hampshire. As a result, WPI's breach of contract and breach of the covenant of good faith and fair dealing claims arise directly out of, or are related to, Super Vision's contacts with New Hampshire.

## 2. Purposeful Availment

To satisfy the purposeful availment prong of the specific jurisdiction test, WPI must show that Super Vision's "participation in the economic life of [New Hampshire]" rose above that of a passive purchaser "who simply place[d] an order and [sat] by until the goods [were] delivered." See Whittaker Corp., 482 F.2d at 1084 (citing In-Flight Devices Corp., 466 F.2d at 232-33). I conclude that WPI has alleged and provided evidence of jurisdictional facts which, if true, demonstrate that Super Vision's contacts with New Hampshire (1) were voluntary, in that they were not the product of WPI's unilateral actions; and (2) created an on-going relationship with a forum resident, thereby making it foreseeable that Super Vision would be haled into court in New Hampshire. In particular, Super Vision's active participation in the negotiation of the terms of the contract and its supervision of WPI's performance of the contract demonstrate that it was not a passive purchaser.

The parties' contract, which involved the sale of relatively

complex products modified to fit the specific requirements of Super Vision's project, was the result of extensive negotiation. While Super Vision was not physically present in New Hampshire during the negotiation period, it did direct extensive communications, by telephone, fax, and email, into the state. These contacts are sufficient to establish jurisdiction. See Sawtelle, 70 F.3d at 1389-90 ("The transmission of information into [the forum] by way of telephone or mail is unquestionably a contact for purposes of our analysis."); see also Massachusetts Sch. of Law, 142 F.3d at 36; Pleasant St. I, 960 F.2d at 1090; In-Flight Devices Corp., 466 F.2d at 235. But see Vetrotex Certainteed Corp., 75 F.3d at 152.

In response to Super Vision's communication of more precise information regarding its ballast and ignitor needs, WPI updated the price quotation it originally issued to Super Vision on October 2, 1998. See Mayer Aff. ¶¶ 6, 7. On October 19, 1998, WPI faxed Super Vision this revised price quotation, which extended the period over which monthly installments were to be

shipped from approximately eleven months to approximately two years.  See id.  Super Vision, however, did not accept WPI's terms of sale without alteration.  See, e.g., id. Ex. F ("Thank you for [Super Vision's] letter and conversation regarding [WPI's] quotation and specifically notes-1 and 3-A.").  Instead, it faxed a purchase order, dated November 6, 1998, to WPI's New Hampshire facility in which it increased the number of units to be shipped during certain months. See id. Ex. G at 1.  The purchase order also added several conditions which WPI was required to accept in order for the deal to proceed.  For example, one condition provided that Super Vision's order with WPI was "contingent upon successful demonstration and acceptance of new designs by Super Vision International."  See id. ¶ 11, Ex. G at 3.  Super Vision faxed to WPI's New Hampshire facility a revised purchase order, dated November 25, 1998, with identical conditions.  See id. ¶ 12, Ex. I.  According to Super Vision, this revised purchase order was intended to be "an offer to

-22-

purchase on its own terms."[2] [Def.'s] Mem. of Law in Supp. of Def.'s Mot. to Dismiss for Lack of Jurisdiction at 13 (doc. no. 5). Even after these exchanges, the parties continued to negotiate the terms regarding their respective performance under the contract. See, e.g., Mayer Aff. Ex. J (letter confirming results of telephone conference between Super Vision personnel and WPI personnel located in New Hampshire).[3]

---

[2] I make no findings regarding what constituted the operative offer, WPI's price quotation or Super Vision's purchase order. Rather, Super Vision's characterization of its purchase order as "an offer to purchase on its own terms" is significant only to the extent that it belies Super Vision's attempt to assume the mantle of the passive purchaser. By taking this position, Super Vision acknowledges that it was an active, not passive, player in the transaction.

[3] This letter, dated December 8, 1998, confirmed that the parties agreed to several conditions, including:

[1] WPI is authorized to proceed with fulfillment of the referenced order for ballasts . . . Approval by Osram [one of Super Vision's lamp suppliers for the project] is no longer a prerequisite. . . .

[2] Super Vision will remove the ignition aid wire from each lamp before installation to facilitate hot restrike.

[3] If we determine later that this approach causes lamp problems in the field, WPI will work with Super Vision to

-23-

Furthermore, the transaction the parties envisioned was not an isolated, one-time sale of goods. Rather, the parties recognized that they were establishing an on-going relationship extending over several months, if not longer. For example, in its October 20, 1998 letter directed to WPI's New Hampshire offices, Super Vision informed WPI that it appeared that their deal would proceed and discussed the possibility of the parties entering into another business relationship. In closing, Super Vision stated that it looked forward "to a close association between [the] respective companies." Id. ¶ 9, Ex. E.

As it turned out, the parties also communicated extensively after they executed the contract. In particular, Super Vision actively supervised WPI's manufacture of the ballasts and ignitors. For example, WPI made regular progress reports to Super Vision regarding the performance of its products. See id. ¶ 13. Representatives from Super Vision and WPI communicated with each other, primarily by email and telephone, to resolve

develop an appropriate course of action going forward. Mayer Aff. Ex. J.

what Super Vision alleged to be technical problems with WPI's products.  See id. ¶ 15; Kingstone Aff. ¶ 14, Ex. 5.  Sometime in the Spring of 1999, a Super Vision employee traveled to WPI's New Hampshire facility for the purpose of working with WPI to resolve these alleged technical problems.  See Mayer Aff. ¶ 15 (June 1999); Kingstone Aff. ¶ 12 (March 1999).  In its July 14, 1998 letter directed to WPI's New Hampshire facility, Super Vision, in addition to informing WPI that it was placing a "hold" on certain WPI products, referred to WPI's "reworks" of other of its products.  See Kingstone Aff. ¶ 13, Ex. 4.

Super Vision's pre- and post-contract contacts with WPI demonstrate that it did not simply place an order with WPI and wait for the goods to be delivered.  Even though Super Vision's active participation in the negotiation and performance of the contract is sufficient to satisfy the purposeful availment prong of the specific jurisdiction test, I briefly address subsidiary jurisdictional facts which reinforce the propriety of this court

exercising personal jurisdiction over Super Vision.

The evidence regarding the parties' prior dealings further erodes Super Vision's attempt to characterize itself as a passive purchaser. To be relevant to the personal jurisdiction inquiry, the parties' dealings prior to the present, disputed contract must be related to that contract. See Vetrotex Certainteed Corp., 75 F.3d at 153 (finding that parties' dealings in the 1980s were not related to the present dispute over their 1991 and 1992 contracts because there was no evidence to suggest that parties understood these contracts to be continuations of their prior dealings). The Seventh Circuit has adopted a similar view, but recognizes that when parties engage in an on-going relationship involving repeated transactions, the dividing line between prior and present dealings "will not always be a bright one." RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1278 (7th Cir. 1997). Where such prior dealings involve a transaction similar to the one the parties presently dispute, these past contacts may be relevant if they either "bear on the substantive

legal dispute between the parties or inform the court regarding the economic substance of the contract."  <u>Id.</u>

Here, WPI and Super Vision, on two prior occasions, entered into installment sale contracts which (1) involved a product similar to the one which is the subject of the contract presently in dispute, (2) extended over a period of several months, and (3) involved a total purchase price in excess of $100,000 each. See Iverson Aff. ¶¶ 2, 3, 4. WPI made its final shipment on the second of these two contracts in February 1998. See id. ¶ 3. In view of the similarities, and close temporal proximity, between these prior transactions and the present one, the parties' prior dealings are relevant to the personal jurisdiction inquiry. In particular, these earlier transactions show that WPI and Super Vision were engaged in an on-going relationship rather than an isolated transaction. See, e.g., Gateway Press, Inc. v. LeeJay, Inc., 993 F. Supp. 578, 581 (W.D. Ky. 1997) (finding that parties' prior contacts on unrelated deal laid the "groundwork" for their future dealings and showed that the parties' relationship "more closely resembled an 'ongoing relationship' than an 'isolated transaction'"). Moreover, that the parties had

business dealings predating the present sale of ballasts and ignitors means that only minimal significance can be attached to WPI's initiation of contact with Super Vision with respect to the present transaction. That is, WPI's reaching out to Super Vision to supply its needs on its new project cannot be viewed as a random solicitation of a passive, unsuspecting buyer.

The terms of the parties' contract also support this court's exercise of personal jurisdiction over Super Vision. The front side of both price quotations that WPI faxed to Super Vision included the term, "F.O.B. Warner, N.H." See Mayer Aff. ¶ 8, Ex. C. The reverse side of the price quotations included a choice of law clause which identified New Hampshire law as the governing law and a delivery clause which indicated that delivery and title passed at the "F.O.B. point of shipment."[4] See id. ¶ 8, Ex. D.

---

[4] There is some question as to whether Super Vision ever received the reverse side of the price quotation, and thus, notice of these conditions. WPI's sales representative handling the Super Vision account cannot recall precisely whether he mailed an original of the price quotation to Super Vision. He asserts, however, that it is his practice to follow up a fax transmission of a price quotation with an original copy sent by mail. See Mayer Aff. ¶ 8. In an affidavit in support of its

The terms of the parties' contract put Super Vision on notice that it was dealing with a New Hampshire seller.  Therefore, it was foreseeable that Super Vision might be haled into New Hampshire's courts if its relationship with WPI broke down.  See Ganis Corp., 822 F.2d at 198 ("While not conclusive, a [choice of law provision] further tips the scales in favor of [plaintiff] since a contractual provision adopting a forum state's laws combined with the five-year duration of the relationship 'reinforce[s] [the nonresident defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'") (quoting Burger

_____

motion to dismiss, Super Vision asserts that it received the front side of the price quotation via fax but that it never received the reverse side.  See Kingstone Aff. ¶ 9.  In contrast, Super Vision, in its memorandum of law in support of its motion to dismiss, states that it eventually agreed to place an order with WPI but that it "rejected the boilerplate terms and conditions contained on the reverse side of WPI's quotation form . . . ." [Def.'s] Mem. of Law in Supp. of Def.'s Mot. to Dismiss for Lack of Jurisdiction at 13 (doc. no. 5) (emphasis added).  Because I am required to view the evidence in the light most favorable to WPI, I assume that at some point Super Vision received, either by fax or by mail, a copy of the conditions printed on the reverse side of WPI's price quotation sheet.

-30-

King Corp. v. Rudzewicz, 471 U.S. 462, 482 (1985)) (alterations in original).[5]

3. Reasonableness

With respect to the reasonableness prong of the specific jurisdiction test, Super Vision concedes that the first four "gestalt" factors are in essence a "wash" and do not "point strongly in favor of this Court exercising or declining jurisdiction in this case." [Def.'s] Mem. of Law in Supp. of Def.'s Mot. to Dismiss for Lack of Jurisdiction at 12 (doc. no. 5). In contrast, Super Vision argues that the fifth factor strongly points in favor of this court declining jurisdiction.

_____

[5] A jurisdictionally significant fact about which WPI failed to provide evidence is the location to which Super Vision sent its payments. Although an important fact in the jurisdictional inquiry, its presence or absence is not dispositive. See Phillips Exeter Academy, 196 F.3d at 291 ("[C]ourts repeatedly have held that the location where payments are due under a contract is a meaningful datum for jurisdictional purposes. Even so, that fact alone does not possess decretory significance.") (internal citations omitted); Ganis Corp., 822 F.2d at 198 ("The location of where payments are to be sent has been recognized as a material contact in jurisdictional analysis.").

According to Super Vision, it would be unreasonable to require it, a passive and innocent nonresident party to the transaction, to litigate this dispute in WPI's home forum when WPI was the initiating and blameworthy party to the transaction. Exercising jurisdiction under these circumstances, so Super Vision argues, would create a precedent allowing

> a manufacturer of faulty goods to advertise, sell and ship these goods to "passive buyers" all over the country. Then, after the manufacturer is unsuccessful in remedying the defects despite having been given months to do so by the buyers, finally forcing the buyers to return the goods, demand a refund and state their intention to purse their legal remedies, the seller sues them in its distant home forum for damages allegedly caused by the buyer's refusal to continue purchasing the faulty goods.

Id. at 14-15.

This argument might have some persuasive force in the abstract. It is, however, unavailing in this case. Contrary to Super Vision's argument, it was not a passive purchaser, and therefore, does not warrant special protection. Because this case implicates no significant public policy issue, the fifth "gestalt" factor does not point strongly in either direction.

On balance, the remaining "gestalt" factors point in favor of this court exercising jurisdiction. First, although Super Vision may be inconvenienced by litigating this case in New Hampshire, it has not demonstrated that having to defend itself here imposes a special or unusual burden on it. See Pritzker, 42 F.3d at 64.

Second, Super Vision erroneously compares the relative interests of Florida and New Hampshire in this case. Instead, I must determine whether New Hampshire has an interest in this case, and if so, the extent of that interest. I need not attempt to compare New Hampshire's interest to that of another potential forum. See Foster-Miller, Inc., 46 F.3d at 151 ("The purpose of the inquiry is not to compare the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum has an interest."). I conclude that New Hampshire has an interest in protecting a local business which contracts to produce over one million dollars' worth of goods in the forum and which is not paid by its customer who orders those goods. See

In-Flight Devices Corp., 466 F.2d at 232 ("[A] state has an interest in resolving a suit brought by one of its residents. That interest necessarily becomes more significant when, as here, a contract calling for substantial production of goods is entered into, with the production of goods and other performance under the contract to take place entirely within the forum state.") (internal citations omitted).

Third, WPI has selected New Hampshire as the forum in which to bring its action against Super Vision. With respect to measuring WPI's convenience, I must pay some deference to its choice of forum. See Sawtelle, 70 F.3d at 1395 ("[A] plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience.").

Finally, the judicial system's interest in the efficient resolution of this case also points in favor of this court exercising jurisdiction. Because Super Vision, subsequent to WPI's filing of this action, has filed an action against WPI in Florida, this case raises the specter of piecemeal litigation. See Nowak, 94 F.3d at 718 ("This factor focuses on the judicial system's interest in obtaining the most effective resolution of the controversy. Usually this factor is a wash but in one case we held that preventing piecemeal litigation might favor one jurisdiction over another.") (internal citations omitted). The most efficient and effective way to resolve the parties' disputes is for Super Vision to file counterclaims against WPI in this action. Super Vision has not asserted that is it prevented from doing so.

Given the relatively strong showing with respect to relatedness and purposeful availment, a correspondingly strong showing of unreasonableness is required. No such showing has been made. Therefore, I conclude that it is reasonable for this

court to exercise personal jurisdiction over Super Vision.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, I conclude that it is constitutionally permissible for this court to exercise personal jurisdiction over Super Vision.  Therefore, I deny Super Vision's Motion to Dismiss for Lack of Personal Jurisdiction (doc. no. 5).

SO ORDERED.


_____
Paul Barbadoro
Chief Judge


January 27, 2000

cc:   Robert Upton, Esq.
      Thomas Donovan, Esq.
      David Jones, Esq.